FILED

02/23/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0031

No. DA 23-0031

IN THE

# Supreme Court of the State of Montana

---

IN RE THE MATTER OF THE ESTATE OF IAN RAY ELLIOT,

DECEASED.

---

ON APPEAL FROM THE MONTANA THIRTEENTH JUDICIAL DISTRICT COURT,
YELLOWSTONE COUNTY, HON. ROD SOUZA
CASE NO. DP-22-0034

---

## PARTIAL MOTION TO DISMISS APPEAL

---

MICHAEL P. MANNING
RITCHIE MANNING KAUTZ PLLP
175 North 27th Street
Suite 1206
Billings, MT 59101
(406) 601-1400
mmanning@rmkfirm.com

*Counsel for Appellee Joseph V. Womack, Special Administrator of the Estate of Ada E. Elliot and Liquidating Partner of StarFire, LP*

## STATEMENT OF THE ISSUE

Appellants Jenny Jing, Alice Carpenter, and Michael Bolenbaugh have appealed two district court orders—a May 23, 2022 order appointing a special administrator in the Estate of Ian Ray Elliot and a December 9, 2020 order denying their Rule 60(b) motion, which asked the court to vacate its earlier order. While their appeal is timely as to the denial of the Rule 60(b) motion, the appeal of the court's underlying order is not. Accordingly, Appellee Joseph Womack, as the special administrator of the Estate of Ada E. Elliot and the liquidating partner of StarFire, LP, moves under Montana Rule of Appellate Procedure 16 to dismiss the portion of the appeal directed to the district court's May 23, 2022 order. Neither Womack nor any other party should have to spend unnecessary time and resources briefing the merits of that part of the appeal, which was filed months too late. Womack has contacted Jing, Carpenter, and Bolenbaugh regarding this motion. They oppose it.

## BACKGROUND

This Court has weighed in multiple times in the lengthy battle over the Estate of Ada Elliot, which has now spilled over into the estate of her deceased son, Ian. Most recently, the Court affirmed the district

1

court's refusal to remove Womack as the special administrator of Ada's estate, approved Womack's actions as the liquidating partner of StarFire, LP, and rejected Ian's bias claims after he was held in contempt. *See In re Est. of Elliot*, 2022 MT 91N (unpublished). In doing so, the Court recognized that "Ian obstructed Womack's administration with constant litigation and unfounded accusations," including filing "numerous, lengthy motions objecting to almost every action by Womack," and suing him personally twice. *Id.*, ¶ 19.

Ian passed away while the last appeal was pending, leaving a will naming his domestic partner, Jenny Jing, and ex-wife, Ann Taylor Sargent, as co-personal representatives. *See* Ex. A, at 1. Because of the historically contentious nature of the proceedings, Womack petitioned for supervised administration of Ian's estate, which Cindy Elliot joined but which Jing and Sargent strongly opposed.[1] *Id.* After holding two evidentiary hearings, the district court entered a detailed 29-page order on May 23, 2022 granting Womack's petition and appointing attorney Andrew Billstein as the special administrator of Ian's estate. *See generally id.* Among other things, the court's 65 findings of fact and 35

---

[1] Cindy and Ian are the sole heirs of Ada's estate.

conclusions of law recount Jing's intimate involvement in Ian's frequent and frivolous *pro se* litigation, her commitment to continuing the same course of action, her conflict of interest due to debts she owes Ian's estate, and her continued unfounded attacks on Womack and inability to work with him. *Id.*

On July 11, 2022, Womack filed a Rule 77(d) notice of entry of the district court's order. *See* Ex. B. He served the notice on all interested parties, including Jing and both Carpenter and Bolenbaugh, who are devisees in Ian's will. *Id.* No party appealed in the next 30 days. Instead, on October 20, 2022—101 days later—Jing, Carpenter, and Bolenbaugh jointly filed a motion invoking Rules 42(a), 60(b) and 60(d) asking the court to: (1) vacate its May 23, 2022 order; (2) allow an independent action to investigate fraud on the court; and (3) consolidate the various Elliot estate cases (the Rule 60(b) motion). *See* Ex. C. The district court denied that motion on December 9, 2022, again issuing a detailed order. *See* Ex. D. On January 9, 2023, Jing, Carpenter, and Bolenbaugh filed their notice of appeal, purporting to appeal not only the December 9 order denying their Rule 60(b) motion, but also the underlying May 23 order appointing Billstein as the special administrator of Ian's estate.

## ARGUMENT

### I.  The Appeal of the District Court's Order Denying the Rule 60(b) Motion Is Timely.

Under Montana law, an order denying a Rule 60(b) motion is a final, appealable order.  *Donovan v. Graff*, 248 Mont. 21, 24, 808 P.2d 491, 493 (1991).  Because Jing, Carpenter, and Bolenbaugh's notice of appeal was filed within 30 days of the district court's denial of their Rule 60(b) motion, they properly perfected their appeal of that order. *See* Mont. R. App. P. 4(5)(a)(i); *see also* Mont. R. App. P. 3.  Accordingly, this motion does not seek to dismiss the portion of the appeal related to the district court's denial of the Rule 60(b) motion.

### II.  The Appeal of the District Court's Underlying Order Appointing a Special Administrator Is Woefully Untimely.

That said, an appeal of the denial of a Rule 60(b) motion "brings up for review only the order of the denial itself and not the underlying judgment."  *Donovan*, 248 Mont. at 24, 808 P.2d at 493.  Thus, to also perfect an appeal of the district court's May 23, 2022 order, Jing, Carpenter, and Bolenbaugh were required to file a timely notice of appeal as to that specific order.  They did not come close.

Under Montana Rule of Appellate Procedure Rule 4(5)(a)(i), Jing, Carpenter, and Bolenbaugh had 30 days after Womack's Rule 77(d)

4

notice to appeal the May 23 order. Accordingly, their notice of appeal needed to be filed no later than August 10, 2022, meaning that their January 9, 2023 notice was 166 days too late. *See, e.g.*, *Greenup v. Russell*, 2000 MT 154, ¶ 15, 300 Mont. 136, 3 P.3d 124 ("[I]t is reasonable to expect all litigants, including those acting pro se, to adhere to procedural rules.").

The Court should reject any argument that Jing, Carpenter, and Bolenbaugh's time to appeal was extended under Rule 4(5)(a)(iii)(E) simply because they later filed the Rule 60(b) motion. Montana law is clear that "a Rule 60(b) motion may not be used as a substitute for appeal." *Donovan*, 248 Mont. at 25, 808 P.2d 494; *see also State v. Osborn*, 2015 MT 48, ¶ 15, 378 Mont. 244, 343 P.3d 1188. Moreover, in unpublished decisions, the Court has interpreted the timeliness requirement in Rule 4(5)(a)(iii)(E) to mean that a Rule 60(b) motion extends the deadline for appealing an underlying order only if it is filed before expiration of the initial time for appealing that order. *See, e.g.*, *Boland v. Boland*, 2020 MT 30N, ¶ 11, 399 Mont. 551, 456 P.3d 588 (Table). Although Womack acknowledges that *Boland* is not precedential, it appears the Court has found this interpretation so

5

fundamentally mandated by the Rules of Appellate Procedure that a published decision elaborating on it has been unnecessary.

The result makes sense—any other rule would allow a party to resurrect a long-forfeited right to appeal merely by filing a Rule 60(b) motion months after the deadline has run. Here, Jing, Carpenter, and Bolenbaugh are trying to do just that. Had they filed their Rule 60(b) motion before August 10, 2022, the deadline to appeal the May 23 order would have run from denial of the Rule 60(b) motion. *See* Mont. R. App. P. 4(5)(a)(iii)(E). But they did not, so their time to appeal expired on August 10. They did not somehow create a *new* right to appeal by filing a Rule 60(b) motion three months later asking the Court to vacate the May 23 order. Rather, they attempted to use Rule 60(b) as a substitute for an appeal, which *Donovan* and other cases forbid.

Simply put, Jing, Carpenter, and Bolenbaugh's appeal of the district court's order appointing a special administrator in Ian's estate is untimely. Consequently, that portion of the appeal should be dismissed to avoid unnecessary merits briefing about an unappealable order.

6

Dated:  January 23, 2023

Respectfully submitted,


*/s/ Michael P. Manning*
RITCHIE MANNING KAUTZ PLLP

*Counsel for Joseph V. Womack,*
*Special Administrator of the Estate of*
*Ada E. Elliot and Liquidating Partner*
*of Starfire, LP*

## CERTIFICATE OF COMPLIANCE

I certify that, pursuant to Mont. R. App. P. 16(3), this response brief is proportionately spaced, has a typeface of 14 points or more, and contains 1,247 words, as determined by the undersigned's word processing program.

/s/ Michael P. Manning
Michael P. Manning
RITCHIE MANNING KAUTZ PLLP

*Counsel for Joseph V. Womack, Special Administrator of the Estate of Ada E. Elliot and Liquidating Partner of Starfire, LP*

MONTANA THIRTEENTH JUDICIAL DISTRICT COURT, YELLOWSTONE COUNTY

| IN THE MATTER OF THE ESTATE OF: | Cause No.: DP 22-34 |
|---|---|
| IAN RAY ELLIOT, | Judge Rod Souza |
| Deceased. | FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER GRANTING PETITION FOR SUPERVISED ADMINISTRATION THAT INTERESTED PERSON JOINED AND APPOINTING SPECIAL ADMINISTRATOR |

This matter comes before the Court on the Petition for Supervised Administration of the Estate of Ian Elliot. The petitioner is Joseph Womack (hereafter "Womack.") [Dkt. 1.] Interested Person Cindy Elliot (hereafter "Cindy") has joined in seeking supervised administration. [Dkt. 9 at 7.] Jenny Jing (hereafter "Jenny") and Ann Taylor Sargent (hereafter "Ann") strongly oppose supervised administration. The Court took evidence through witness testimony and admission of exhibits during a hearing on March 7, 2022 and April 1, 2022. [Dkts. 25, 36.] Now the Court makes the following:

FINDINGS OF FACT

*Introducing the Parties*

1. The deceased is Ian Ray Elliot (hereafter "Ian"). Ian died on December 19, 2021.

2. Jenny was Ian's domestic partner.

3. Ann is Ian's ex-wife.

4. Adrian Elliot Olson (hereafter "Adrian") is Ian's nephew.

5. Ex. B to Dkt. 7 is a copy of Ian's will. The will appoints Jenny and Ann as co-personal representatives of Ian's estate. [Ex. B at 1 to Dkt. 7.] All parties agree the will is valid.

1

6. Ian was the son of Ada H. Elliot (hereafter "Ada") and one of two heirs to her Estate. Ada passed away in January 2017. Before she died, Ian was appointed Ada's guardian, and Joyce Wuertz was appointed Ada's conservator.

7. Ian's sister Cindy is the other heir to the Estate of Ada Elliot.

8. The major asset in Ada's Estate is StarFire, Limited Partnership (hereafter "StarFire.") Ian and Cindy are StarFire's two general partners. Cindy was StarFire's primary manager and handled its business affairs. StarFire's primary asset is farmland (called the Ecton Ranch) in Gallatin County, Montana. Long before Ada passed, Ian and Cindy had been embroiled in conflict and litigation over StarFire.

9. After Ada passed away, Ian sought appointment as personal representative of Ada's Estate. At this point, Ian was represented by counsel. Cindy objected. In June 2017, Judge (now Montana Supreme Court Justice) Gustafson granted Cindy's petition for special administration. [DP 17-36, Dkt. 29.] In her order, Judge Gustafson directed the parties to confer and attempt to agree on a special administrator. Ian notified the Court agreement could not be reached. [Dkt. 31.]

10. Ian requested Judge Gustafson amend her prior decision. [DP 17-36, Dkt. 30.] Approximately one month after the motion and supporting brief was filed, Ian's counsel sought withdrawal. [DP 17-36, Dkt. 36.] Judge Gustafson permitted Ian's counsel to withdraw. [DP 17-36, Dkt. 37.]

11. From this point forward, Ian represented himself. Concomitant with this self representation, the Estate's administration has been marred by contentious litigation.

12. Now self-representing, Ian appealed appointment of special administrator to the Montana Supreme Court. The Montana Supreme Court affirmed Judge Gustafson appointing a special administrator. *In re Estate of Elliot*, 2018 MT 171N, ¶¶ 11-12, 393 Mont. 538, 421 P.3d 795 (table opinion). The Court observed that Ian's "motion to alter

2

and amend and for reconsideration" requested "the [district] court...re-evaluate the evidence and reach a different conclusion,...a request the [district] court was under no obligation to honor." 2018 MT 171N at ¶ 10.

13. After remand, Judge Knisely assumed jurisdiction on December 6, 2018. [DP 17-36, Dkt. 54.] In May 2019, Judge Knisley appointed Duncan Peete as the Special Administrator of Ada's Estate. [DP 17-36, Dkt. 60.] However, as Mr. Peete's law firm previously represented Ian, Mr. Peete resigned. [DP 17-36, Dkt. 59.] Judge Knisely then appointed Joe Womack as special administrator on May 30, 2019. [DP 17-36, Dkt. 60.] Womack has been a licensed Montana attorney since September 1984. The Montana Supreme Court described Womack as "the natural choice for liquidating partner given his extensive experience and the disqualifying acrimony between" Ian and Cindy. *In re Estate of Elliot*, 2022 MT 91N at ¶ 16.

14. The contentious litigation pursued by Ian referenced in Finding of Fact No. 11 *supra* will be detailed *infra* beginning with Finding of Fact 24. At this point, the Court turns to Ian's nephew, Adrian Olson. Adrian provided compelling testimony regarding the role of Jenny Jing, Ian's domestic partner in Ian's ongoing litigation strategy. Adrian also offered important insight on the long-running family dispute between Ian and Cindy and Adrian's efforts to resolve the conflict.

*Jenny Jing's longstanding involvement in Ian's litigation*

15. Adrian and Ian were very close. At one point, Ian had custody of Adrian. Adrian would visit Ian in Montana yearly.

16. In 2013, on his way to Glacier National Park, Adrian spent a week in Billings. As a mediator and peacemaker (the litigation between Cindy and Ian having destroyed the family), Adrian proposed selling the entire Gallatin property. Ian and Cindy would then equally split the proceeds. Cindy and Ian agreed.

3

17. Jenny Jing, Ian's domestic partner, became upset with Ian. A heated argument ensued. At one point, Jenny started screaming at Cindy. Adrian believed the conflict could turn physical between Jenny and Cindy. To deescalate, Adrian's girlfriend escorted him away. When the proposal and explosive reaction happened, Adrian did not know Jenny well and was shocked how interested she was in the affairs of Adrian's family. Adrian commented the situation "blew his mind." Jenny's disagreement led Ian to reject Adrian's proposal.

18. Due to Adrian's close relationship with Ian, Adrian attempting to serve as peacemaker in the dispute between Ian and Cindy, and his ability to recall details of the meeting almost nine years later, the Court deems Adrian's testimony credible and entitled to great weight. Moreover, Womack detailed a timeline of events early in his tenure as special administrator of Ada's estate that similarly showcased Jenny's involvement with Ian and her perpetuation of the acrimonious dispute between Ian and Cindy. Womack held a meeting with Ian, Cindy, and her attorney. Jenny was excluded from this meeting. During the meeting, Ian was very kind, and an agreement was reached. After the meeting (with Jenny now having access to Ian), Ian's position diametrically changed. Ian proclaimed Cindy, her attorney, and Womack were all lying about the outcome of the meeting, which necessitated another hearing in front of Judge Knisely.

19. Adrian testified Jenny assisted Ian with his court filings. On multiple occasions he saw Jenny on a computer working on court documents. Adrian specifically referenced observing Jenny frequently on the computer over a two-week period in 2017 (which would be the early stages of DP 17-36, years before Womack was appointed). In 2018, Adrian observed Jenny working on legal matters. Adrian regularly conversed with Ian and Jenny regarding how much legal research and writing she completed for Ian.

4

"Exhibit A"

20. Adrian also compared Jenny's and Ann's filings in this case with Ian's *pro se* filings. Adrian described Jenny's and Ann's filings as having the same style, headings, and numbering as well as the same tactic of "objecting to everything" and "aggressive statements."

21. Womack testified Jenny has appeared at every hearing and was at every meeting Womack had with Ian. Jenny has attempted to speak during court hearings, and Judge Knisely had to order her to stop speaking. The papers Jenny and Ann have filed in this case have the same formatting as the papers Ian filed in Ada's probate case and have the same type of inflammatory allegations that were in the papers Ian filed *pro se*. Ian told Womack that Jenny helped with research throughout Ada's probate case.

22. Therefore, the Court finds Jenny has been heavily involved with Ian's decisions and questionable litigation tactics for years. If Jenny serves as co-personal representative, she will pick up where Ian left off. Jenny will not work with Womack. Jenny will pursue litigation to the detriment of Ian's estate and the Estate of Ada Elliot. Such actions will cascade to needlessly delay closure and squander Ian's Estate's remaining assets.

23. The Court details below the expansive fora of Ian's *pro se* litigation.

*Ian's Litigation Strategy*

24. Cindy filed the case of *StarFire v. Ian Elliot*, DV 2014-829 in Montana's Eighteenth Judicial District before the Hon. Holly Brown. Cindy commenced that case to remove Ian as a StarFire general manager. Ian represented himself.

25. Judge Brown said Ian "is cautioned that legally unfounded motions filed with the Court can subject him to sanctions by the Court, including the payment of attorney's fees." [DV14-829, Dkt. 67 at 4.] Judge Brown moreover "direct[ed Ian] to Rule 11, M.R.Civ.P., specifically including Rule 11(b), relating to the representations made to

5

"Exhibit A"

the Court by a party upon the filing of any pleading, motion, or other paper, and the availability of sanctions for a violation of Rule 11 by a party." [*Id.*]

26. Judge Brown issued an order requiring mediation that also bolded for emphasis "[w]illful failure of a party to schedule, attend[,] and/or participate in good faith in the mediation may result in...sanctions, up to and including...ent[ry of] default." [DV 14-829, Dkt. 117.] Despite this clear, strong language, Ian filed a motion essentially asking "the Court to...vacate its...[o]rder... requiring...mediation." [DV 14-829, Dkt. 119.] Judge Brown denied this motion. [*Id.*] This case has been closed.

27. In Ada's guardianship/conservatorship case, DG 2014-132 in Yellowstone County, Ian *pro se* moved to remove Ms. Wuertz as conservator. [Dkt. 26.] Judge Gustafson denied Ian's motion. [DG 2014-132, Dkt. 36.] Ian appealed, and the Montana Supreme Court affirmed denial of removal. *In re the Estate of A.H.E.*, 2016 MT 315N, ¶¶ 12, 14, 16, 386 Mont. 395, 384 P.3d 114 (table opinion).

28. Nevertheless, in DV 18-536 in Yellowstone County, Ian filed suit against Terry Seiffert, Joyce Wuertz, Michael Usleber and everyone else involved in the conservatorship, including Glen Pike, Ada's and StarFire's accountant.

29. Usleber and his law firm moved to dismiss for failure to state a claim. [DV 18-536, Dkt. 11.] In Montana, a litigant must satisfy a high threshold before obtaining such a dismissal. "A dismissal under Rule 12(b)(6) is likely to be granted only in the unusual case in which plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Glaude v. State Compensation Ins. Fund*, 894 P.2d 940, 942 (Mont. 1995). Despite this high threshold, Judge Harada dismissed all of Ian's claims that she was specifically asked to dismiss. [DV 18-536. Dkt. 28.]

6

30. *Elliot v. Elliot*, 1:15-cv-00107 is a case Ian filed in the U.S. District Court for the District of Montana. Ian accused Cindy and her d/b/a of negligence, fraud, and breach of fiduciary duty in administering StarFire and taking care of Ada.

31. A settlement was reached between StarFire, Cindy, and Womack (on behalf of Ada's Estate). Ian strenuously objected to the settlement. All but Ian's derivative claims were dismissed. Ian appealed the dismissal to the Ninth Circuit Court of Appeals. The Ninth Circuit dismissed Ian's appeal for lack of standing. Ian's actions consumed money, time, and a substantial amount of effort. Ian's derivative claims were stayed pending a complete accounting of StarFire.

32. Ian interfered with completion of this accounting. Ian sent the accountant an email stating there was a restraining order against Womack which precluded Womack from paying the accountant without consent of Ian or the Court. Not only was this email false but also it resulted in the accountant temporarily stopping work, delaying completion of the accounting.

33. DV 20-244 is a Yellowstone County case where Ian sued Womack. Ian's multi-count complaint alleged Womack's administration of StarFire and Ada's Estate breached fiduciary duty and committed "negligence and/or abuse of discretion." [DV 20-244, Dkt. 1 at 12 (internal emphasis omitted). Like DV 18-536, Judge Knisely dismissed this case at the pleading stage. [*Id.*, Dkt. 16.]

34. Ian, individually and derivatively on StarFire's behalf, filed DV 21-811, a *pro se* complaint against Womack in Yellowstone County. [Dkt. 1.] Ian's complaint raised claims of fraud, constructive fraud, breach of fiduciary duty, and negligence. [*Id.* at 15-17.] Ian summarized his complaint in DV 21-811 as rewriting and refiling his complaint that Judge Knisely dismissed in DV 20-244. [Ex. N at 6-7.] The proposed Amended Complaint attached to Ian's Motion to Amend [dv 20-244, dkt.6] raises the same claims

7

(fraud, constructive fraud, breach of fiduciary duty, and negligence) as his complaint [dkt. 1] in DV 21-811. This was improper procedure. One must appeal adverse district court decisions to the Montana Supreme Court, not subsequently refile them in another district court. Article II, Section 7 of the Montana Constitution gives the Montana Supreme Court exclusive appellate jurisdiction over Montana district courts.

35. DV 21-811 is pending before the Honorable Ashley Harada (including Womack's motions to dismiss and for summary judgment and Womack's motion to have Ian declared a vexatious litigant). [DV 21-811, Dkts. 8, 10.] Along with violations of various Montana Rules of Civil Procedure, Womack is seeking dismissal based on res judicata and collateral estoppel. [DV 21-811, Dkt. 9.]

36. As referenced *supra*, DP 17-36 is the probate of Ada's Estate. Womack described Ian's *pro se* litigation as duplicative and repetitious, repeatedly raising the same points. Review of DP 17-36 and Ian's extraordinary number of filings therein reveals the accuracy of Womack's characterization.

37. Judge Knisely held a hearing on April 22, 2021. During the hearing, Judge Knisely orally ruled she had no intent "to entertain further objections to or attempted interference with Womack's performance of his duties as...Special Administrator...." [Ex. E-1 at 18. *See, also,* DP 17-36, Dkt. 151.]

38. After Judge Knisely's oral ruling, Ian told a broker "Womack's authority to sell Starfire...property was still in dispute" and his later email to the broker suggested Womack lacked authority to sell StarFire real estate. [Ex. E-3 at 2.] Ian's communications precipitated the broker withdrawing from listing and sale activities. Judge Knisely had to hold Ian in contempt and state her willingness to use incarceration, "fines, and other severe measures" to force Ian's compliance with court

8

orders. [Ex. E-3 at 2.] It is remarkable Judge Knisely had to threaten incarceration to achieve compliance with a court order.

39. Even before Judge Knisely issued findings and conclusions, Ian moved for additional findings and amended findings, to alter or amend the order, for a new trial, and to stay the order. [DP 17-36, Dkt. 155.] Ian previously argued his mere moving for an injunction constituted a court order precluding Womack from paying expenses. [Ex. E-1 at 4-5. *See, also*, DP 17-36, Dkt. 130 at 2-3.]

40. The order denying Ian's motion to amend findings and for additional findings, to alter or amend, or for new trial stated Ian's "current [m]*otions* include nothing more than frivolous arguments to again delay the progress of this 2017 Estate proceeding to closure." [Ex. E-2 at 4.] Judge Knisely said Ian "continues to frustrate the Court's [o]rders and cause great difficulty and financial expense for the other parties." [Ex. E-2 at 4.]

41. On July 16, 2021, Ian moved to stay pending appeal. [DP 17-36, Dkt. 171.] Judge Knisely denied this motion. [DP, 17-36, Dkt. 175.] Judge Knisely described Ian's argument as "nonsensical," and another as "meritless." [DP 17-36, Dkt. 175 at 3-4.] The order characterizes Ian's request for discovery as "a fishing expedition to support motions containing baseless allegations." [*Id.* at 4.]

42. On September 15, 2021, Ian petitioned the Montana Supreme Court for Writ of Injunction, Supervisory Control, or Other Appropriate Writ. *Elliot v. Womack and Elliot*, OP 21-473, Petition. The Montana Supreme Court issued an order denying and dismissing Ian's Petition. *Elliot v. Womack and Elliot*, OP 21-473, Order.

43. Ian then sought to remove Judge Knisely. On December 7, 2021, Ian requested disqualification of Judge Knisely alleging bias based on her previous rulings. [Ex. N.] The Montana Supreme Court issued an order denying this request as void and stated

9

adverse rulings "cannot support disqualification." [Ex. E-4.] Ian seeking disqualification led to yet more delay as all matters in Ada's Estate were halted until the Montana Supreme Court issued a ruling. Adrian reviewed Ian's *pro se* litigation and was most upset at Ian seeking disqualification. Adrian's sentiment reflects Montana Supreme Court precedent.

44. "[A] judge's previous adverse rulings against a party do not constitute sufficient evidence to demonstrate a judge's personal bias or prejudice against that party." *State v Strang*, 2017 MT 217, ¶ 25, 388 Mont. 428, 401 P.3d 690 (citing cases). "Disqualify[ing] judges for bias was never intended to enable a discontented litigant to oust a judge because of adverse rulings made." *State v. Guill*, 2008 Mont. Dist. LEXIS 715, *16, ¶ 26 (20th Jud. Dist.) (internal quotation marks omitted) (quoting *Ex parte American Steel Barrel Co.*, 230 U.S. 35, 43-44 (1913)).

45. Ian appealed Judge Knisely's orders in DP 17-36 to the Montana Supreme Court. On May 12, 2022, the Montana Supreme Court issued an unpublished opinion unanimously affirming Judge Knisely. *In re Estate of Elliot*, 2022 MT 91N. The Montana Supreme Court stated "[t]he record demonstrates that, however sincere he may have been, Ian obstructed Womack's administration with constant litigation and unfounded accusations." *In re Estate of Elliot*, 2022 MT 91N at ¶ 19. The Court also stated Ian "filed numerous, lengthy motions objecting to almost every action by Womack, and even sued him twice personally." *Id.* "[D]espite his oft-stated purpose to save money for the Estate, Ian's interference objectively and significantly increased costs and delays, further necessitating the second sale. Womack spent a considerable amount of time responding to Ian's various motions and lawsuits, time which was necessarily charged to the Estate." *In re Estate of Elliot*, 2022 MT 91N at ¶ 23.

10

46. The Montana Supreme Court described Womack as "the natural choice for liquidating partner given his extensive experience and the disqualifying acrimony between" Cindy and Ian. 2022 MT 91N at ¶ 16. "[R]ulings in favor of Womack do not equate to bias against Ian." *In re Estate of Elliot*, 2022 MT 91N at ¶ 27. The Court also described Ian's position as "not the reality of the situation." *Id.* at ¶ 23. The Montana Supreme Court stated "the accounting was essential to ending the seven years of litigation over StarFire and the almost five years of litigation over the Estate." *Id.* at ¶ 23.

47. The orders and opinions referenced *supra* all regard motions or appeals Ian filed *pro se*. This *pro se* litigation in multiple fora reveal troubling themes. The first was Ian's willingness to make arguments unsupported by law or fact, and second was Ian's unwillingness to accept adverse court rulings or comply with court orders. Ian's objections have tremendously delayed, arguably by years, closing of Ada's probate case and have caused exponential escalation of Womack's fees.

## A special administrator must be appointed to avoid undue delay and a conflict of interest.

48. The Montana Supreme Court stated "Ian similarly struggled to stay within the scope of questioning and limit his arguments to the present issues during hearings." *In re Estate of Elliot*, 2022 MT 91N at ¶ 28. This statement exactly describes Jenny's conduct during the March 7, 2022 and April 1, 2022 hearings. Jenny's conduct revealed she would frustrate administration of Ian's estate.

49. Jenny asked questions having nothing to do with whether to appoint a special administrator. For example, Jenny asked questions regarding Ada's care in 2010 and 2011, around 11 years before the hearing. Also, Jenny repeatedly launched into testimony while examining witnesses. The Court sustained countless objections on this issue. However, Jenny persisted.

11

"Exhibit A"

50. Jenny additionally asked questions and argued the Court needed to accept Ian's will after Womack and Cindy made clear at the start of the March 7 hearing they were not challenging that will. Equally important, much of Jenny's questioning of witnesses was meant to cast aspersion on Womack, Cindy, and Adrian. This shows Jenny's lack of understanding that a special administrator would be neutral, making decisions involving the Estate after their own investigation and would not be an extension of Womack or Cindy.

51. During the hearings, Jenny demonstrated unwillingness to accept adverse rulings. During questioning by Ann, Womack characterized Jenny as dogmatic, argumentative, and persistent with the same things over and over again. The Court believes Womack's testimony that how Jenny acted in this case is precisely what happened in DP 17-36.

52. Moreover, Jenny is incapable of working with Womack. Jenny insists on having only written communication with Womack, a position Ann adopted during the first meeting she had with Womack. The Court agrees with Womack's characterization of Jenny's feelings towards him as anger and hatred.

53. As the March 7, 2022 hearing drew to a close, the Court asked Jenny what she wanted, and Jenny launched into an expansive narrative where she disparaged Womack and an attorney involved in Ada's conservatorship. Jenny described Womack as "predatory" and "not ethical." Of significant note, this is the exact language "Ian" used to describe Womack in his written motion to recuse Judge Knisely. [DP 17-36, Dkt. 188 at 2 ("predatory" and "unethical") Dkt. 188 at 10 ("predatory.")] The fact that the same. precise language was used to disparage Womack is compelling evidence that Jenny has consistently engaged in ghostwriting of Ian's documents. Even if not so, Jenny has fully embraced Ian's long-term litigation strategy of casting Womack as an enemy which will

12

inevitably delay closure of the Estate and further increase Womack's already mounting fees.

54. During the March 7 and April 1, 2022 hearings, Jenny suggested Ian acted alone. However, this claim is belied by Jenny's own sworn court filing opposing Womack's petition. [*See* Dkt. 7.] In that filing Jenny acknowledged previously performing legal research for Ian. [Dkt. 7 at 4.] She supported this acknowledgment by referencing a transcript of a hearing in DP 17-36 where Ian testified Jenny assisted him with legal research. [Dkt. 7 at 4 (citing Ex. D).] Ian said Jenny "helps me do research on when I'm being falsely accused." [Ex. D to Dkt. 7.] Upon further questioning, Ian acknowledged Jenny had helped him and referenced "legal advice." [Ex. D to Dkt. 7.]

55. Jenny finally answered the Court's question of what she wanted by stating she wanted Womack investigated. However, Judge Knisely in DP 17-36 refused Ian's repeated attempts to remove Womack. [*See* Exs. E-1, E-2, DP 17-36, Dkt. 175.] The Montana Supreme Court affirmed Judge Knisely's denial of removal and described Ian's position as "not the reality of the situation." *In re Estate of Elliot*, 2022 MT 91N at ¶¶ 18, 23. *See, also*, ¶ 19 ("Ian forced Womack to fight for virtually every decision, even those that the District Court expressly placed within his discretion, most notably obtaining a full accounting of StarFire. Womack nonetheless acted professionally as special administrator and liquidating partner.")

56. Womack is not only the Special Administrator of Ada's Estate but also StarFire's liquidating partner. The major asset of Ada's Estate is land still owned by StarFire. Thus, whether it is a special administrator or a personal representative handling Ian's estate, that person must work with Womack. Jenny is incapable of doing so.

57. Moreover, if the Court appointed Jenny as co-personal representative, she would have a conflict of interest due to financial records indicating Ian lent Jenny and her entity (Win

13

Win Star) a substantial amount of money. The conflict arises because Jenny disclaims the full amount of the debt. During testimony, Jenny acknowledged Ian probably put between $20,000 and $30,000 into her home. However, when questioned about Ian transferring $21,000 to Jenny during the last year of his life, Jenny denied the scope of the transfers. She stated transfers probably totaled $2,000. Ian's financial records admitted as evidence demonstrate Jenny vastly underestimated the total amount of these transfers—hence a conflict of interest arises.

58. Ex. V are bank statements covering activities in Ian's account from December 2020 to December 2021, the time period in question regarding the financial transfers. These bank statements show Ian transferred to Jenny or Jenny's entity, Win Win Star, a total of $21,900. Jenny's debt to the Estate, the extent of which she denies incentivizes Jenny to delay Estate administration.

59. Moreover, Ian asked Adrian for $25,000 in October 2021. This request took place after Ian received $25,000 from Ada's Estate. Adrian was concerned about the amount of money Ian needed. Also, Ian mortgaged his home (with a co-signor who is now concerned about repayment) after StarFire previously paid off Ian's mortgage. Ian's need for money, the independent financial evidence of substantial transfers of money to Jenny or her entity, and Jenny's minimization of money she received from Ian further reveal Jenny's conflict of interest.

60. Heightening the Court's concern is the plain language requirement in Ian's will (as recounted *supra* and *infra*) that Ann and Jenny serve together as personal representatives and "must act unanimously."

61. Ann was not a part of Ian's *pro se* litigation. Ann also was able to formulate relevant, coherent questions and make her points during the hearing. However, Ann signed every filing made in this case, and these filings are similar in tone to Ian's filings recounted

14

"Exhibit A"

*supra*. The Court especially notes the Memorandum of Law (signed by Ann and Jenny) that states Ian's *pro se* litigation "should be able to survive and be carried out by [his] estate." [Dkt. 35.01 at 9, 14.]

62. Even if Ann disagreed with Jenny's commitment to continue Ian's *pro se* litigation tactics, as recounted *supra*, Ian's will nominates Ann and Jenny as co-personal representatives. Moreover, Ian's will states "[m]y [p]ersonal [c]o-representatives must act unanimously." [Ex. B at 3 to Dkt. 7.] The plain language of Ian's will does not empower the Court to appoint Ann as sole personal representative of Ian's estate.

63. Adrian supports special administration of Ian's estate. Adrian is an heir to Ian's estate. As an heir, Adrian is concerned the absence of special administration will lead to continuing litigation, and the Estate incurring additional attorney's fees. Adrian opined Ian's objection to everything and aggressive litigation strategy would continue if the Court were to appoint Jenny and Ann as co-personal representatives of Ian's estate.

64. Adrian expressed dismay at the time and money Ian wasted and that Ian passed away before he could enjoy a single dollar of his inheritance. The Court shares Adrian's incredulity at the result of Ian's *pro se* litigation strategy. Instead of enjoying inheriting a substantial estate, Ian needed to borrow $8,000 from Womack in the 15 months before Ian died to repair his home and his car and to pay for a doctor's visit, a time when Ian also faced possible foreclosure on his home and "serious credit card problems." [Exs. L and M.]

65. Lastly, Jenny and Ann observed that even if the Court made them co-personal representatives, they would still need to hire a Montana attorney to represent the Estate in court. This does not obviate the need for a special administrator. A special administrator must act in the best interest of the estate. *See In re Estate of Elliot*, 2022 MT 91N at ¶ 24. As discussed extensively *supra*, the Court finds Jenny and Ann would

15

frustrate administration of the Estate. Jenny and Ann having to hire an attorney would not impact their intent, motivation, or intransigence toward Womack.

## CONCLUSIONS OF LAW

1. To the extent any preceding Finding of Fact is better suited as a Conclusion of Law or a Conclusion of Law is better suited as a Finding of Fact, they are hereby stated as such.

2. The Court has jurisdiction to determine whether to grant Womack's Petition for Supervised Administration that Cindy joined.

3. Under M.R. Evid. 202(b)(6) "[r]ecords of any court of this state or of any court of record of the United States" are proper subjects of judicial notice. Court orders in DV 14-829 (Montana's Eighteenth Judicial District) and court orders in DG 14-132, DV 18-536, DP 17-36, DV 20-244, and DV 21-811 (all of Montana's Thirteenth Judicial District) constitute "records of any court of this state." *See, also, State v. Homer,* 2014 MT 57, ¶ 8, 374 Mont. 157, 321 P.3d 77 (internal citation omitted) (M.R.Evid. 202(b)(6) encompasses "prior proceedings in other cases...and...in the same case.") The Montana Supreme Court's opinions at 2016 MT 315N, 2018 MT 171N, and 2022 MT 91N, its order denying Ian's writ petition in OP 21-473, and its order denying as void Ian's request to recuse Judge Knisely in PR 21-0001 are also records of a Montana court. The court file in the federal court case between Cindy and Ian constitutes a "[r]ecord...of any court of record of the United States." Thus, the Court can take judicial notice of the court files in these cases.

4. Judicial notice is proper because what Judge Brown, Judge Knisely, the federal court, and the Montana Supreme Court said about and how they ruled on Ian's *pro se* litigation "is not subject to reasonable dispute." *See In re Marriage of Carter-Scanlon,* 2014 MT 97, ¶¶ 22-23, 374 Mont. 434, 322 P.3d 1033. A court order or opinion speaks for itself. *See Gray v. Beverly Enterprises-Mississippi, Inc.,* 390 F.3d 400, 407, f.n. 7

16

**"Exhibit A"**

(5th Cir. 2004) ("[T]he fact that a judicial action was taken is indisputable and is therefore amenable to judicial notice.") During the March 7, 2022 hearing neither Jenny nor Ann objected to the request for judicial notice. Moreover, the Court indicated it would take judicial notice during the April 1, 2022 hearing in response to Jenny's questions about Ian's federal case.

5. M.R.Evid. 202(d)(2) states "[a] court shall take judicial notice [of records of Montana courts and federal courts of record] when requested by a party and supplied with the necessary information." Womack, as petitioner for supervised administration, has requested judicial notice and supplied the Court with the necessary information to take such notice. [Dkt. 23.] During the March 7, 2022 hearing Cindy, as an interested person, also asked the Court to take judicial notice, and offered as exhibits the documents needed to take such notice. Thus, the Court must take judicial notice of Ian's *pro se* litigation analyzed *supra*.

6. "A special administrator may be appointed....in a formal proceeding by order of the court on the petition of any interested person and finding, after notice and hearing, that appointment is necessary to preserve the estate or to secure its proper administration, including its administration in circumstances where a general personal representative cannot or should not act." Mont. Code Ann. § 72-3-701(2).

7. Appointing a special administrator "is necessary to preserve [Ian's] estate or to secure its proper administration." As explained more fully *supra*, Ian's *pro se* litigation in multiple fora has revealed his willingness to make arguments unsupported by law or fact and his unwillingness to accept adverse court rulings or comply with Court orders. Judge Brown warned Ian he could face sanctions from filing legally unfounded motions and referred him to M.R.Civ.P. 11. Judge Knisely has described Ian's arguments as "frivolous," "nonsensical," and "meritless" and his allegations as "baseless." The

17

Montana Supreme Court denied Ian's request to disqualify Judge Knisely as void. Judge Knisely had to hold Ian in contempt and threaten him with incarceration to obtain his compliance with court orders.

8. Jenny was inextricably intertwined with Ian in his *pro se* litigation. As recounted more fully *supra*, Adrian observed Jenny multiple times on a computer working on court documents. Ian and Jenny openly conversed with Adrian about the legal research and writing she regularly did for Ian. Jenny has appeared at every hearing with Ian and at every meeting Ian and Womack had. Jenny's confrontational and accusatory attitude towards Ian's litigation is longstanding. In 2013, Jenny exploding at Adrian's proposed settlement led Ian to reject the proposal. Adrian described Jenny's interest in Ian's litigation as shocking. Jenny's *pro se* filings in this case are similar to Ian's *pro se* filings in formatting, style, and confrontational and aggressive tone.

9. During the March 7 and April 1, 2022 hearings, Jenny demonstrated the same "struggle[s] to stay within the scope of questioning and limit...arguments to the present issues during hearings" that the Montana Supreme Court observed of Ian. *See In re Estate of Elliot*, 2022 MT 91N at ¶ 28. Jenny has argued about and asked questions of witnesses to support the validity of Ian's will even after Womack and Cindy said in open court they were not challenging Ian's will. Jenny has opposed supervised administration by attacking Womack and Cindy even after she was told repeatedly a special administrator would make decisions independent of Womack and Cindy. Jenny repeatedly testified while asking questions. Jenny repeatedly asked irrelevant questions. Jenny asked the same questions over and over after answers were given. The Court sustained countless objections to her questions.

10. The Court acknowledges Ann's ability to concisely question and succinctly make her points during the hearing as well as Ann having no part in Ian's *pro se* litigation.

18

"Exhibit A"

Nevertheless, Ann has joined each of Jenny's accusatory and confrontational *pro se* filings in this case.

11. Moreover, as recounted *supra*, Ian's will specifically names Jenny and Ann as co-personal representatives and requires their unanimity to act. The Court must respect Ian's intent that Jenny and Ann both be personal representatives and not appoint Ann as a single personal representative.

12. Ann's and Jenny's chief argument against appointing a special administrator is Ian's will appointed them co-personal representatives of his estate. [Dkt. 35.01.] However, Mont. Code Ann. § 72-3-701(2) does not state a special administrator can be appointed only in the absence of a will nominating a personal representative. The Court cannot edit a Montana statute. Mont. Code Ann. § 1-2-101. Moreover, testator intent does not overrule the statute's plain language. *In re Estate of Sauter*, 189 Mont. 244, 615 P.2d 875 (Mont. 1980). In *Sauter*, the Montana Supreme Court observed testator intent was for Mr. Werner to serve as personal representative. *Sauter*, 189 Mont. at 245-46, 249, 615 P.2d at 876, 878. Nevertheless, the Montana Supreme Court applied the plain language of Mont. Code Ann. § 72-3-701 to reverse the district court and to order appointment of a special administrator regarding the fate of an alleged estate claim that Mr. Werner's law partner had been defending. 189 Mont. at 248, 250-51, 615 P.2d at 877-79. *See, also, In re Estate of Franchs*, 722 P.2d 422, 424 (Colo. Ct. App. 1986) (When the record supports the necessity of appointing a special administrator "to preserve the estate and to secure its proper administration," "the probate court did not abuse its discretion in appointing a...special administrator, despite spouse's statutory priority for appointment as personal representative."); "[A] common thread in all of the foregoing provisions is that appointment of a special administrator is appropriate only where action or inaction by the personal representative designated by the decedent may

19

be adverse to the interests of the decedent's estate." *Relf v. Shatayeva*, 998 N.E.2d 18, 32, ¶ 51 (Ill. 2013).

13. As recounted more fully *infra*, Ann and Jenny have cited caselaw from other jurisdictions on removing a personal representative. The Court agrees caselaw analyzing removal of personal representative sheds light on whether to grant special administration. Under Montana law, "a person interested in the estate may petition for removal of a personal representative for cause at any time." Mont. Code Ann. § 72-3-526(1)."Cause for removal [of a personal representative] exists...when removal would be in the best interests of the estate." Mont. Code Ann. § 72-3-526(2)(a). Montana law authorizing a court to remove a personal representative for cause further supports testator intent does not defeat a petition for special administrator.

14. The Montana Supreme "Court has given broad authority to district courts to remove personal representatives so long as the grounds for such removal are 'valid and supported by the record.'" *In re Estate of Boland*, 2019 MT 236, ¶ 55, 397 Mont. 319, 450 P.3d 849. *See, also, In re Estate of Anderson-Feeley*, 2007 MT 354, ¶ 9, 340 Mont. 352, 174 P.3d 512 ("[W]e will not overturn a removal unless there is clear abuse of discretion."); *In re Estate of Elliot*, 2022 MT 91N at ¶ 21. In *Boland*, the testator's will nominated two of his children as co-personal representatives of his estate. 2019 MT 236 at ¶ 2. The will's explicit nomination did not prevent the Montana Supreme Court from affirming removal of a co-personal representative based *inter alia* on § 72-3-526. *See Boland*, 2019 MT 236 at ¶¶ 55-58. "The pleadings, testimony, and extensive litigation and harassment show[s the co-personal representative's] pattern of hostility towards opposing counsel." 2019 MT 236 at ¶ 57. Ian objecting to virtually everything Womack sought to do--necessitating a response and a hearing--constitutes a pattern of hostility.

20

"Exhibit A"

As recounted *supra*, Jenny's conduct during the March 7, 2022 and April 1, 2022 hearing shows she despises Womack and will not work with him.

15. In affirming removal of the co-personal representative, *Boland* additionally observed the co-personal representative's "out-of-bounds conduct has produced a multitude of cases, repetitive motions, unnecessary delay and costs, factual contentions lacking in evidentiary support, and legal maneuvers unwarranted by existing law." 2019 MT 236 at ¶ 57. Unfortunately, as explained *supra*, Ian's *pro se* litigation strategy and tactics (with which Jenny played an integral role) have also featured out-of-bounds conduct resulting in each of the effects listed in *Boland*. The Court has already enumerated Ian's repetitive motions, factual arguments without evidence, and legal arguments totally unsupported by precedent. Ian's strategy of opposing almost everything Womack has done resulted in delaying the closing of Ada's Estate, arguably for years, and exponentially increasing fees. Ian created a multitude of cases staggering in scope. He sued everyone involved in Ada's conservatorship in a case pending before Judge Harada. He sued Womack personally in a case that Judge Knisely dismissed, and his motion to disqualify her from Ada's probate case confirms that rather than properly appeal dismissal, he refiled the same case before another Yellowstone County District Judge. Ada's probate case spans nine files and has reached a staggering 194 docket entries. If the Court were to appoint Ann and Jenny as co-personal representatives, this number would only increase further as Jenny will carry out Ian's decision to oppose the accounting, a decision he made before the accounting was complete. The Court notes the finished accounting is very favorable to Ian.

16. The Montana Supreme Court has also affirmed removal of a personal representative under § 72-3-526 upon a district court's specific finding "that significant hostility and alienation existed between Robert and the Sisters and that Robert's removal would

21

enable an expeditious settlement and closure of the estate." *In re Estate of Greenheck*, 2001 MT 114, ¶¶ 19-20, 305 Mont. 308, 27 P.3d 42. As recounted *supra*, hostility and alienation characterized Ian's interaction with Womack, and everything the Court observed from Jenny during March 7 and April 1, 2022 hearing confirms she has the same hostile attitude towards Womack that Ian did. Ann has also indicated her lack of trust in Womack by insisting in their very first meeting that all communications between them be in writing. The presence in this case—of reasons the Montana Supreme Court has previously utilized to affirm removing a personal representative— further support granting special administration.

17. "The existence of a potential claim against Feeley is sufficient to create a conflict of interest, and such conflict of interest is sufficient for removal of Feeley as personal representative of Jan's estate." *Estate of Anderson-Feeley*, 2007 MT 354 at ¶ 13. As recounted *supra*, the Estate has a claim against Jenny for the money Ian lent her. Under *Feeley*, this is sufficient for a conflict to interest to exist that warrants removing a personal representative. This case has the additional features of Jenny significantly minimizing the amount of money Ian lent her despite documentary evidence to the contrary, Ian taking out a mortgage on his home (with the co-signor now worried about repayment) even though StarFire had previously paid off his mortgage, and Adrian expressing concern about the amount of money Ian claimed to need in the months before Ian's death.

18. Ann and Jenny argue Womack lacks standing to seek special administration because he is not a creditor. [Dkt. 35.01 at 2.] Judge Knisely issued an order approving an "[a]greement for StarFire…to Make Loans to Limited Partners and Heirs." [Ex. Z.] Moreover, in correspondence with Womack, Ian called the transaction a "loan." [Ex. L.] Therefore, Womack is a creditor.

22

19. Ann and Jenny assert challenging appointment of personal representative circumvents their demanded jury trial. [Dkt. 35.01 at 3.] As recounted *supra*, district courts have "broad authority...to remove personal representatives." *See, also, In re Estate of Elliot*, 2022 MT 91N at ¶ 26 (rejecting Ian's claimed right to a jury trial).

20. Ann and Jenny quote *In re Estate of Kuralt*, 2000 MT 359, ¶ 14, 303 Mont. 335, 15 P.3d 931. [Dkt. 35.01 at 7.] *Kuralt* does not analyze Mont. Code Ann. §§ 72-3-701 or 72-3-526.

21. "In 1974, Montana adopted a version of the Uniform Probate Code." *Northland Royalty Corp. v. Engel*, 2014 MT 295, ¶ 9, 377 Mont. 11, 339 P.3d 599. Ann and Jenny discuss case law from the Montana Supreme Court that predates Montana's adoption of the Uniform Probate Code. [Dkt. 35.01 at 3, 5-7, 9.] These cases cannot alter the plain language of Mont. Code Ann. §§ 72-3-701 or 72-3-526. The Court nonetheless observes Ann and Jenny quote Justice Milburn's concurring opinion in *State ex rel. Eakins v. District Court*, 34 Mont. 226, 85 P. 1022 (Mont. 1906). [Dkt. 35.01 at 4.] Justice Milburn's concurrence instructs the probate court "to save as much as possible of the assets for those to whom they belong." 34 Mont. at 232, 85 P. at 1024. *See, also, Gonzales v. Yaunick (In re Estate of Gonzales)*, 977 P.2d 1284, 1287 (Wyo. 1999) ("[T]he aim of probate procedure is the speedy settlement and adjudication of rights in the property of a decedent to the end that those entitled to share may have the fullest benefit of the right which the law gives them at the earliest moment consonant with due process and orderly procedure.") This language strongly supports granting special administration. As recounted *supra*, the largest asset of Ada's estate is land presently held by StarFire. Judge Knisely denied Ian's repeated requests to remove Womack, and the Montana Supreme Court unanimously affirmed her denials. Thus, a special administrator or personal representative of Ian's estate must work with Womack.

23

Jenny's conduct reveals animosity toward Womack and incapability of working with him. Meanwhile, Ian's will requires Jenny and Ann act unanimously as co-personal representatives. Therefore, saving as much of Ian's estate as possible for Ian's heirs is incompatible with appointing Jenny and Ann as co-personal representatives.

22. Ann and Jenny quote *In re Estate of Wittman*, 2001 MT 109, 305 Mont. 290, 27 P.3d 35. [Dkt. 35.01 at 10.] *Wittman* states "[m]ere suspicion that undue influence may have or could have been brought to bear is not sufficient." 2001 MT 109 at ¶ 21. As shown *supra*, regardless of the level of Jenny's influence, much more than mere suspicion supports the Court's finding that appointing Ann and Jenny as co-personal representatives will perpetuate Ian's *pro se* litigation strategy of arguments lacking evidentiary or precedential support and Ian's unwillingness to accept adverse court rulings or to comply with court orders.

23. Moreover, Ann and Jenny argue "a decedent's pending actions should be able to survive and be carried out by the decedent's estate" and cite Mont. Code Ann. § 27-1-501. [Dkt. 35.01 at 9.] Mont. Code Ann. § 27-1-501 states "the action or defense survives and may be maintained by the party's representatives or successors in interest." (emphasis added). "[M]ay' is permissive." *Gaustad v City of Columbus (In re Investigative Records of the City of Columbus Police Dep't)*, 272 Mont. 486, 488, 901 P.2d 565, 567 (Mont. 1995). Thus, contrary to Ann's and Jenny's position, a personal representative has discretion to continue litigating Ian's cases. The Montana Supreme Court said "[w]hen the law created a mechanism whereby one person as a representative of a group could conduct litigation, the purpose was the efficient, speedy, and orderly determination of rights which were held in common." *State ex rel. Palmer v. District Court*, 190 Mont. 185, 189, 619 P.2d 1201, 1203 (Mont. 1980). Neither efficient, speedy, nor orderly can describe Ian's scorched earth legal campaign that accomplished

24

little but wasted time and money while ensuring Ian could not enjoy when alive the benefits of a substantial inheritance.

24. Ann and Jenny quote decisions of other state and federal courts to support their argument that the Court must defer to Ian selecting them as co-personal personal representatives. [Dkt. 35.01 at 11-13.] However, granting special administration would not be the outlier this list makes it seem. First, of the listed states, Arizona and Wisconsin have similar statutes. *See* Arizona Rev. Stat. § 14-3614 (Allowing appointment of special administrator upon necessity "to preserve the estate or to secure its proper administration."): Wis. Stat. § 867.07(7) ("Other circumstances exist which in the discretion of the court require the appointment of a special administrator.")

25. Second, Jenny and Ann quote *Estate of Buchman*, 267 P.2d 73 (2d Dist., Cal. Ct. App. 1954). [Dkt. 35.01 at 11.] *Buchman* quotes the maxim Jenny and Ann reference, i.e. "whom the testator will trust so will the law." Compare 267 P.3d at 81 with [Dkt. 35.01 at 6 (emphasis omitted).] Significantly, *Buchman* also states "[a] testator's selection of an executor should not be annulled except on a clear showing that the best interests of the estate require it." 267 P.3d at 80. As shown *supra*, the best interests of this estate require special administration.

26. Third, Jenny and Ann quote *In re Estate of Mumma*, 41 A.3d 41 (Pa. Super. 2012). [Dkt. 35.01 at 12.] *Mumma* states "removal of a personally chosen individual is thus considered to be a 'drastic remedy' that requires clear and convincing evidence of a substantial reason for removal." 41 A.3d at 50. However, 20 Pa.C.S. § 3182(5) authorizes "[t]he Court…to remove a personal representative…when, for any other reason, the interests of the estate are likely to be jeopardized by his continuance in office." Analyzing its precedents, Pennsylvania's high court has instructed when ill-

25

feeling runs so deep as to harm the estate's best interest, it warrants removal even if the testator chose the executor. *In re Estate of Lux*, 389 A.2d 1053, 1060 (Pa. 1978).

27. Fourth, Ann and Jenny quote West Virginia law. [Dkt. 35.01 at 13-14.] West Virginia's high court has stated "[o]ne may be considered unsuitable for the appointment…who is otherwise so adversely interested to heirs, creditors, or other kindred, as to prejudice the due settlement of the estate, if it be placed under his charge." *Smith v. Harmer*, 64 S.E.2d 481, 486 (W.V. 1951).

28. Fifth, Ann and Jenny reference Florida law. [Dkt. 35.01 at 11.] Florida's Fourth District Court of Appeal affirmed denying appointment of a will's nominee as personal representative upon the finding "it is apparent that if [the nominee] were to be appointed as a personal representative, this Estate would be locked in endless and unnecessary litigation that would impede the administration of this Estate." *Boyles v. Jimenez*, 330 So. 3d 953, 959-60 (Fla. 4th Dist. Ct. App. 2021). *See, also, Hernandez v. Hernandez*, 946 So. 2d 124, 127 (Fla. 5th Dist. Ct. App. 2007 ("Where a dispute will cause unnecessary litigation and impede the estate's administration, and either the person lacks the character, ability, and experience to serve or exceptional circumstances exist, the totality of circumstances may permit the court to refuse to appoint the personal representative named in the will.")

29. Other persuasive precedents exist warranting granting special administration. "Where, however, the designated person is in a position or has acted in a manner antagonistic toward the interests of the estate or the heirs in a way indicating that his administration of the estate would probably result in prolonged and unnecessary difficulty or expense, then such a person should not be appointed as executor." *In re Estate of Petty*, 608 P.2d 987, 995 (Kan. 1980) (emphasis added). A finding of unsuitability for appointment as executor "may also be based upon…a mental attitude…towards some person interested

26

in the estate that creates reasonable doubt whether the executor or administrator will act honorably, intelligently, efficiently, promptly, fairly and dispassionately in his trust." *Tiffany v. Tiffany (In re Estate of Ragan)*, 541 N.W.2d 859, 861 (Iowa 1995). The Indiana Court of Appeals affirmed removing a personal representative upon evidence supporting "animosity and ill-feeling, and the effect that it had upon the orderly administration of the estate." *Estate of Jaworski v. Jaworski*, 479 N.E.2d 89, 92 (Ind. Ct. App. 1985). "[W]here ill will exists which would result in more litigation the court may appoint any suitable person even if that person is outside of the family." *In re Estate of Jones*, 93 P.3d 147, 156 (Wash. 2004).

30. The Court does not lightly appoint a special administrator. *See In re Estate of Hannum*, 2012 MT 171, ¶¶ 28, 33, 366 Mont. 1, 285 P.3d 463 (Disfavoring removal of a personal representative, and instructing "removal is harsh and severe, and irregularities that are not directly harmful will be overlooked, and if the court can remedy the matter readily, no removal will be ordered."); *See, also, In re Estate of Elliot*, 2022 MT 91N at ¶¶ 17-18. As recounted *supra*, Jenny was heavily involved with and will continue Ian's *pro se* litigation tactics. Jenny will not work with Womack despite multiple courts refusing to remove him. Further, Womack is the liquidating partner of StarFire, the holder of the biggest asset of Ada's estate, which will be the biggest asset in Ian's estate. Jenny's strategy is directly harmful to Ian's estate because it will only delay closure of Ian's Estate (and Ada's Estate which has been pending for almost 5 years) and will greatly increase expenses, i.e. Womack's fees (already significantly increased due to Ian's tactics). Unfortunately, the only ready remedy is to grant special administration. This finding is compounded by Ian's will nominating Jenny and Ann as co-personal representatives and requiring them to act unanimously. These are extreme and special

27

equitable circumstances warranting appointing a special administrator. *See In re Estate of Long*, 225 Mont. 429, 437, 732 P.2d 1347, 1352 (Mont. 1987).

31. The Court provided a substantial amount of time to the parties to present their case. Over two days, the Court received approximately 12 hours of testimony. However, Jenny provided virtually no pertinent evidence to oppose Womack's Petition for Special Administration that Cindy joined.

32. "The District Court has broad discretion in determining issues relating to trial administration." *Fink v. Williams*, 2012 MT 304, ¶ 18, 367 Mont. 431, 291 P.3d 1140. "One matter of 'trial administration' is the establishment by the court of 'a reasonable time limit on the time allowed to present evidence." 2012 MT 304 at ¶ 18. In *Fink*, the Montana Supreme Court observed the parties had ample notice of the reasonable time they had to present their case. *Fink*, 2012 MT 304 at ¶ 18.

33. During the Court's March 7, 2022 hearing, Cindy was provided approximately six hours to present her case. [Dkt. 25.] Cindy's case ended at 4:14 p.m. [Dkt. 25.] Womack, Adrian, and Ann did not have any witnesses. [Dkt. 25.] The Court then asked Jenny if she had witnesses. Jenny said yes but observed they were not in the Courtroom. Jenny did not subpoena her witnesses in advance despite having six weeks advance notice of the time set for hearing. [*See* Dkt. 3.]

34. Upon learning Jenny had not subpoenaed witnesses despite the extensive notice, the parties objected to Jenny having further opportunity to call witnesses. Nevertheless, the Court said it would schedule a second day of trial to facilitate Jenny's case. Jenny then began her case and recalled Adrian as a witness. Before the March 7, 2022 hearing ended, the Court reiterated its oral ruling by referencing a second day for Jenny to "finish presenting her testimony and calling any witnesses she intends to call."

28

35. The second day was scheduled for April 1, 2022. At this hearing, the Court provided Jenny with approximately six additional hours, resulting in more time than Cindy had to present her case. Although the Court provided a greater amount of time to Jenny, the Court commented after hours of testimony on April 1, 2022 that it had received "virtually no relevant information" on the issue of appointing special administrator. Before the Court broke for the lunch recess, the Court informed Jenny "this is ending today, so you better get to it." At around 2 p.m. on April 1, 2022, the Court told Jenny her time to present evidence would end at 4 p.m. that day. The Court additionally repeatedly reminded Jenny of the 4 p.m. deadline as it drew closer. Thus, this case is similar to *Fink* where the Montana Supreme Court observed the trial court divided the two days set for trial "almost equally between the parties." 2012 MT 304 at ¶ 19. Jenny had sufficient opportunity to present her case. She neither presented compelling evidence to oppose special administration nor to support her nomination as co-personal representative.

Therefore, **IT IS HEREBY ORDERED** that Womack's Petition for Supervised Administration that Cindy joins is GRANTED. The Court HEREBY APPOINTS Andrew Billstein, Esq. as Special Administrator of Ian's Estate.

**IT IS SO ORDERED.**

DATED: this ___23rd___ day of ___May___, 2022.

Hon. Rod Souza, District Court Judge

cc: Ann Taylor Sargent (via email) ann2022ian@gmail.com

Jenny Jing (via email) jennyianmt@gmail.com

Joseph Womack, Esq. (via email) jwomack@jvwlaw.com

29

Cindy Elliot, via Jeffrey A. Hunnes, Esq. (via email) jhunnes@feltmartinlaw.com

Cindy Elliot via Joseph Soueidi, Esq. (via email) jsoueidi@feltmartinlaw.com

Adrian Olson (via email) acelegstrong@yahoo.com

W. Scott Green, Esq. (via email) sgreen@ppbglaw.com

Holly Marie Dudley (via email) MotherHolly@gmail.com

Emily Sapp (via email) emilyesapp@gmail.com

Mike Bolenbaugh (via email) m.bolenbaugh@gmail.com

Alice Carpenter (via email) up2u2do@gmail.com

Shelley Paterson (via email) pattersonss@yahoo.com

Ray Ecton & Ian Elliot Trust, via email to Jenny and Ann at their emails *supra*

Andrew Billstein, Esq. (via email) andrew@bmslaw.com

CERTIFICATE OF SERVICE
This is to certify that the foregoing was duly served by email/mail or hand delivery upon the parties or their attorneys of record at their last known addresses this 23rd day of May, 2020.

BY _____
Judicial Assistant to Hon. Rod Souza

30

Joseph V. Womack
WOMACK & ASSOCIATES, LLC
1001 S. 24th St. W., Ste. 318
Billings, MT 59102
Phone: (406) 252-7200
Email: jwomack@jvwlaw.com



CLERK OF THE
DISTRICT COURT
TERRY HALPIN

2022 JUL 11 A 9: 45

FILED

BY_____
DEPUTY

*Special Administrator for the*
*Estate of Ada E. Elliot and Liquidating*
*Partner of Starfire, SP*
*Interested Parties to this Proceeding*

MONTANA THIRTEENTH JUDICIAL DISTRICT COURT, YELLOWSTONE COUNTY

| | |
|---|---|
| IN THE MATTER OF THE ESTATE OF<br><br>IAN RAY ELLIOT,<br><br>Deceased. | Case No.: DP-22-0034<br><br>Hon. Rod Souza |

### NOTICE OF ENTRY OF FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER GRANTING PETITION FOR SUPERVISED ADMINISTRATION THAT INTERESTED PERSON JOINED AND APPOINTING SPECIAL ADMINISTRATOR

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

Pursuant to Rule 77(d), M.R.C.P., you will please take notice that on May 23, 2022, Findings of Fact, Conclusions of Law and Order Granting the Petition of Joseph Womack for the Supervised Administration of the Estate of Ian Elliot that Interested Person Cindy Elliot joined were entered in the foregoing cause and the Court appointed Andrew Billstein, Esq. as Special Administrator of the Estate of Ian Ray Elliot.

A true copy of the Findings of Fact, Conclusion of Law and Order Granting Petition for Supervised Administration that Interested Person Joined and Appointing Special Administrator is

**"Exhibit B"**

Supervised Administration that Interested Person Joined and Appointing Special Administrator is attached hereto as "Exhibit A" and is being served upon you at this time.

RESPECTFULLY SUBMITTED this _____ day of July, 2021.

WOMACK & ASSOCIATES, LLC

By: _____
Joseph V. Womack, Attorney and
Special Administrator for the
Estate of Ada E. Elliot and Liquidating
Partner of Starfire, LP

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that on the _7th_ day of _July_, 2022, I mailed and emailed a true and correct copy of the foregoing by the method shown below or addressed to the following interested parties:

| | |
|---|---|
| Jeffery A. Hunnes<br>Felt Martin, P.C.<br>2825 3rd Ave. N., Ste. 100<br>Billings, MT 59101<br>*Attorneys for Cindy Elliot*<br>**Email only** to:jsoueidi@feltmartinlaw.com | Ann Sargent<br>210 W. Grant Street, Apt. 202<br>Minneapolis, MN 55403-2243<br>**Email only** to: ann2022ian@gmail.com |
| Adrian Elliot Olson<br>9 Grant Street, Apt. A<br>Redlands, CA 92373<br>**Email only** to: acelegstrong@yahoo.com | Jenny Q. Jing<br>10 Alpine Pl.<br>Kearny, NJ 07032-1608<br>**Email only** to: jennyianmt@gmail.com |
| Holly Marie Dudley<br>1226 Hallinan Circle<br>Lake Oswego, OR 97034<br>**Email only** to: MotherHolly@gmail.com | Ray Ecton & Ian Elliot Trust<br>Jenny Jing and Ann Sargent<br>6540 Amsterdam Rd.<br>Manhattan, MT 59741<br>**Email only** to: jennyianmt@gmail.com |
| Ray Ecton & Ian Elliot Trust<br>Jenny Jing & Ann Sargent<br>2512 Golden Blvd.<br>Billings, MT 59102-1212<br>**Email only** to: jennyianmt@gmail.com | Alice Carpenter<br>407 S. 34th Street<br>Billings, MT 59101<br>**Email only** to: up2u2do@gmail.com |
| Emily Sapp<br>426 NE 92nd Ave.<br>Portland, OR 97220<br>**Email only** to: emilyesapp@gmail.com | Mike Bolenbaugh<br>2460 Village Lane, Apt. 209-B<br>Billings, MT 59102<br>**Email only** to: m.bolenbaugh@gmail.com |
| W. Scott Green<br>Patten, Peterman, Bekkedahl & Green, PLLC<br>2817 2nd Ave. N., Ste. 300<br>Billings, MT 59101<br>**Email only** to:sgreen@ppbglaw.com | |

By: _[signature]_

1

**"Exhibit B"**

Jenny Jing
10 Alpine PL.
Kearny, NJ 07032
jennyianmt@gmail.com
Alice Carpenter
P.O. Box 22702
Billings, MT 59104
up2u2do@gmail.com
Mike Bolenbaugh
2351 Solomon Ave, Apt. 334
Billings, MT 59102
m.bolenbaugh@gmail.com
Pro Se

CLERK OF THE
DISTRICT COURT
TERRY HALPIN

2022 OCT 20 P 3: 48

FILED
BY _____ (59)
DEPUTY

## MONTANA THIRTEENTH JUDICIAL DISTRICT COURT, YELLOWSTONE COUNTY

|  |  |
|---|---|
| IN THE MATTER OF THE ESTATE OF IAN R. ELLIOT, Deceased. | ) DP 22-0034 ) Hon. Judge Rod Souza ) ) MOTION TO ) 1. VACATE 5/23/2022 ORDER ) 2. ALLOW AN INDIPENDENT ) ACTION TO INVESTIGATE ) FRAUD ON THE COURT ) 3. CONSOLIDATE THE CASES ) AND MEMORANDUM OF LAW ) IN SUPPORT THE MOTION ) |

1. Pursuant to Montana Rule of Civil Procedure Rule (MRCP) Rule 60(b) and (d),

Rule 42(a) (1), (2) and (3), Alice Carpenter (Alice), Jenny Jing (Jenny), Mike

Bolenbaugh (Mike), respectfully submit this motion and memorandum of law in

support the motion. The opposing parties would object to our motion.

### INTRODUCTION

2. Ian and Womack's conflicts in Ada Elliot estate matters involved Ian's

**"Exhibit C"**

allegations against Womack's misrepresentations and actions in

a. Shielding Ada and Starfire's former fiduciary Cindy's fraud and breaches;

b. Purposely creating more than $1 million "administration expenses" for a solvent company with a simple operation of paying 6-8 bills of approximate $26,000 from its annual rental income of approximate $60,000.

3. After Ian's death, Cindy and Womack opposed to appoint Ian designated personal representatives Ann Sargent and Jenny, because Jenny participated in Ian's actions against Cindy and Womack, and Jenny stated that she would continue Ian's surviving actions according to Ian's wishes.

4. This Court's 5/23/2022 order ruled in Womack's favor and denied Ann and Jenny's appointment.

5. We request a Rule 60 (b) and (d) relief to vacate this Court's 5/23/2022 order based on the facts indicating attorneys' fraud on the court, which results in gross injustice and weakens the public trust of our judicial system.

## BACKGROUND FACTS

### A. Ian's Actions Protected Ada And Ada's Properties

6. When Ada's two children Ian and Cindy's conflicts involved their parents' care, Ian always stood firm and took actions to protect their parents.

7. In 2005, 2 years after Cindy moved Ada and Archie to live in an isolated life at the ranch's modular home, Ian noticed Archie's serious depression of not willing

"Exhibit C"

to get out of bed daily. Ian insisted to Cindy that "Dad is going to die" and brought his parents Ada and Archie Elliot back to live in Billings.

8. In August 2010, Archie died. Cindy placed Ada to live in a caregiver's basement and paid the caregiver with Ada's $2,000 monthly social security and teacher's retirement fund for the reason that the family could not afford other options for Ada's care.

9. Ian expressed his concerns to Cindy that this caregiver did not treat Ada well. At the time, Jenny only offered to help Ian take care of Ada when she was visiting Ian in Montana, but declined to help taking care of Ada year around.

10. Without any other options, Ian arranged two part-time caregivers to visit Ada for 2 hours every other weekdays. Ian himself took Ada out to stay with him a few hours the rest of the weekdays and every weekend. Ian did not ask to be paid.

11. In 4 months, Ada experienced 2 emergency room treatments for injuries in this caregiver's home. One of the treatments was from a fall resulting in a 2 inch stitches on Ada's scalp. Cindy defended her arrangement and the caregiver.

12. Ian called Jenny for help. Jenny came to Montana and helped Ian to move Ada out of this caregivers home and to lived in Ian's home.

13. During the rest 6 years of Ada's life, Ian and Jenny took care of Ada 24/7, and received support and comfort from Ian's friends. Alice and Mike are among them.

14. Cindy then went to the Senior Center and talked to attorneys with all kinds of

"Exhibit C"

disinformation about Ian.

15. At first, Ian and Jenny thought that Cindy did this because Cindy did not want to appear that she did not want to take care of her own mother so she did not want Ian to take care of Ada either.

16. In 2012, after Cindy claimed the $242,000 net dry land sale proceeds she received half a year ago were used out to pay for Ada and Archie's previous care expenses, Ian and Jenny started to have doubt. After more than one year paying all of Ada's expenses, they realized that Ada's care was not as expensive as Cindy previously claimed when she sold more than $2 million Ada's properties.

17. Ian asked Cindy to provide him with Ada's bank and credit card statements. Cindy promised to provide but asked Ian for patience stating health issues and the pressure dealing with her divorce.

18. Cindy's son and Ian's nephew Adrian Olsen, while living outside of Montana and seldom visited Ada for years, all stated in the same tone that Ian should go out to find a job making his own money instead of taking care of Ada for Ada's retirement money and had conflict with Cindy.

### B. Cindy And Attorneys' Efforts To Manipulate The Accounting

19. For 8 years of the courts' proceedings as of today, no accounting were conducted to examine Ada's personal bank and credit card accounts.

20. Ada's conservator Joyce Wurtz, took her counsels advise to withheld the

"Exhibit C"

accounting/audit and signed a resolution with Cindy to sell Starfire's remaining properties.

21. Ada estate's special administrator Womack, also had Cindy's assistance to be appointed as Starfire's liquidating partner to sell Starfire's remaining properties.

22. Both of them took Cindy's suggestion to conduct a Starfire accounting so as to avoid examining the additional more than $1 million transactions in Ada's personal bank and credit card accounts which Cindy had sole access to.

23. This irregularity of Ada/Ada estate's trustees avoiding to conduct the accounting regarding Ada's personal finances is unusual, especially when it happened under the court supervisions.

24. It is the result of attorneys' manipulations and misrepresentations to the courts for the purpose to shield Cindy when they needed Cindy's assistance to cash in more than $1 million Ada's properties because the properties are under Starfire's name.

25. This motion focuses on Attorney Womack's misrepresentations, which was instrumental in this Court's 5/23/2022 ruled in Womack's favor.

26. We have filed an intervention in Ian's surviving actions, Case DV 21-811. In order to prevent duplicated actions, we submit Exhibit A, and ask this Court to consolidate the cases or hold a joint hearing, in deciding whether we stated our claims with clear facts and evidence for some of Womack's misrepresentations to

"Exhibit C"

the courts which induced the courts' rulings in Womack's favor.

## LEGAL ARGUMENT

### I. This Motion Is In Accordance With MRCP Rule 60(b) And (d)

27. Rule 60 (b) permits a district court to reopen and relief a court order or judgement for the reason of mistake, "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party".

28. Rule 60 (d)(1) allows the relief for an independent action to relieve a party from a judgment, order, or proceeding. Rule 60 (d)(3) allows the relief for setting aside a judgment for fraud on the court.

29. Our motion satisfies Rule 60 (b) and (d) relief to set aside this Court's 5/23/2022 Order because the Order was based on the mistakes from both the Court's side and Jenny's side, and on attorneys' misrepresentations which constitutes a fraud on the Court that affect this Court's ultimate conclusions.

### A. The Mistakes, Inadvertence, Or Excusable Neglect

30. **a)** Jenny made several mistakes in the court hearings. One of them was that she answered Cindy counsel's tricky question when she was not served with Ian's bank statements. Cindy counsel asked how much money Jenny thought she received from Ian in 2021? Jenny answered she thought was about $2,000. The correct calculation is $8,900 after Jenny was able to review Ian's bank statements. This mistake made the Court believed that Jenny was trying to

"Exhibit C"

minimize the amount. Ian sent his money from his bank account in Montana to Jenny's bank account in New Jersey to support their living expenses there when they lived together as domestic partners and Jenny lost her rental income due to the pandemic.

31. Although Jenny had repeatedly and explicitly stated, and Ian's loan co-signer also stated that Jenny promised to pay Ian's loan before and after Ian's death, the opposing parties kept pushing their legally unfounded suggestion to gave this Court an impression that Jenny did something wrong.

32. **b)** This Court then mistakenly believed the amount was $21,000 because the opposing counsel's pushing the $21,000 multiple times with their miscalculation of adding the fund Jenny transferred into Ian's account as the fund Jenny received. The approximate $21,000 mortgage loaned to Jenny was guaranteed by Jenny's house sale proceeds during 2018-2019 instead of during 2020 and 2021. So, Jenny's mistaken difference was $6,900, not trying to minimize from $21,000 to $2,000.

33. **c)** There are other mistakes Jenny made such as her zoom connection sometimes froze and she was too embarrassed to keep asking the court or the witness to repeat what she did not hear well, and she did not know she could object to judicial notice, etc., but this motion is rather focused on Rule 60(d), attorney's fraud on the court.

"Exhibit C"

## B. Fraud On The Court

34. The Montana Supreme Court stated that

> "M. R. Civ. P. 60 is modeled on F. R. Civ. P. 60, so we look to interpretation of the Federal Rules for guidance." *Marriage of Remitz*, Note 2.

35. The 9th Circuit Court held that,

> "Since attorneys are officers of the court, their conduct, if dishonest, would constitute fraud on the court." *Alexander v. Robertson*, (882 F. 2d 421, (9th Cir. 1989)), citing *H.K. Porter Co. Inc. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115, 1119 (6th Cir.1976)

### a) Womack's Misrepresentations And Telling Half Truth In This Court

36. We incorporate some of Womack's misrepresentations to the courts submitted in Exhibit A in this motion. Despite these misrepresentations not happened in this Court, they resulted in the previous court rulings in Womack's favor, which in turn affected this court's 5/23/2022 order also in Womack's favor.

37. In this Court's hearings, Jenny had showed several incidence how Womack was untruthful and evasive under oath, and how Womack sworn to tell the whole truth but told the Court only the half truth to mislead the Court. For example:

38. Womack told the court that he conducted Ada estate's accounting. Yet he contradicted himself in his inability to tell the court where in his accounting report was Ada estate's accounting. Cindy counsel's objections helped Womack to evade his further contradicting his testimony.

39. Womack also testified that Jenny talked Ann to refused converse with him

"Exhibit C"

while what Ann actually said was she would like to talk via email;

40. Womack filed this litigation stating Jenny claimed "a purported Ian's will but refused to provide" so to gave the court an impression that Jenny was planning something sinister. Womack omitted the fact that Ann and Jenny informed him in writing just 4 days ago, that they would provide Ian's notarized Last Will with affidavits under penalty of perjury after they received Ian's death certificate. Womack and Cindy could have provided to Ann and Jenny with Ian's death certificate that Cindy already possessed, instead of initiating their litigation.

41. In *Selway v. Burns*, (429 P. 2d 640 Mont. 1967), the Montana Supreme Court stated that the "concealment of facts by a person who was under a legal duty to make a full disclosure to the court" and "affirmatively misrepresenting facts" constitute fraud on the court "that goes to the very integrity of the judicial system because the court is mislead and made one of the victims of the fraud."

42. Womack also misrepresented to the Montana Supreme Court. One of the misrepresentations was Ian obstructed his administration. This misrepresentation was rebutted in this Court's 4/1/2022 hearing when Jenny used opposing parties' exhibits of courts' dockets as the evidence and showed that Ian did not obstruct or stall the cases. However, Ian's estate did not have the chance to submit a Reply Brief to show this to the Montana Supreme Court.

43. In this Court's hearings, Womack frequently advised this court not to allow

"Exhibit C"

Ann and Jenny to be a temporary placeholder to retain an attorney in submitting Ian estate's Reply Brief, which could give Ian's estate a chance to rebut the misrepresentations in Womack's Answer Brief thus "presenting its case fully" to the Montana Supreme Court.

> "The fraud that will move a court of equity to exercise its inherent power to vacate judgments has been described as that which prevents the unsuccessful party from having a trial or presenting its case fully." *Id.* ref. *Clark v. Clark*, 64 Mont. 386, 210 P. 93

44. The Montana Supreme Court gave Ian's estate a chance of a 60 day extension, despite stated that the reply brief was not mandatory thus not necessary. The reply brief is in the Montana Appeal Procedure for a reason. Although it is optional, Ian's estate did not opt-out this option. Womack's actions blocked it. Womack's advice to this Court to prevent Ian's estate to be fully heard in the Montana Supreme Court constitutes a fraud on the court.

45. In *Synanon Found., Inc., v. Bernstein,* 503 A.2d 1254 (D.C.1986), Synanon counsels told the district court that interrogatories would be unduly burdensome to listen 10,000 audio tapes, and indices of the tapes did not exist. The DC Appeal Court held that the attorneys had perpetrated a fraud on the court with misrepresentations, which influenced the course of the district court's discovery rulings in Synanon's favor, and attorneys' "destroying materials they thought subject to discovery" was also to "corrupt the administration of justice." *Id.*

"Exhibit C"

46. Womack's misrepresentations and his withheld/destroy the audio record (Exhibit A, p13-14 ) which is subject to the discovery are parallel to Synanon counsels' acts.

**b) Opposing Counsels Knowingly Presented A Witness With Fabricated Facts**

47. 1) Opposing counsels knew that after Ada died, Ian never agreed to sell properties except let Womack sell the 2 building sites. In order to prove Jenny was with some kind of bad quality or character, they prepared their witness Adrian to testify with fabricated facts that Adrian saw Jenny was angry and "screamed at Ian" when Ian signed the contract to sell properties in 2017.

48. 2) Opposing counsels also knew that in 2014, after Ian refused to sell Starfire's remaining properties, Cindy sued Ian for "causing liabilities to Starfire" by signing property listing "in bad faith". Ian then submitted the evidence of Cindy's misrepresentations to the Court. When Adrian was with Cindy visiting Ian in 2013, Ian refused to sign the listing and Jenny was on the same side with Ian and confronted Cindy who withheld Ian's health insurance payment as a coercion. After they left, Cindy sent a letter to Ian fraudulently told Ian that listing Starfire's property was a condition required by Starfire's bank loan, or Starfire's properties would face bank foreclosure. (Exhibit B). Ian then signed the listing and told the Realtor how much he cherished the land that his Grandma and Uncle Ray left. (Exhibit C) Ian later

contacted the bank loan officer who stated that the bank never had such loan condition to Starfire. (Exhibit D)

49. Therefore, Cindy's counsels knew that either before or after Ada's death, there was no such possibility at all for Adrian to witness Ian signing a property sale contract which caused "Jenny was angry and screamed at" Ian or Cindy.

50. 3) Please see Adrian's own email to Ian stating why he did not want to contact Ian for 15 years after Ian's emails asking Adrian to keep contact. (Exhibit E) and Ian's efforts to connect with Adrian. (Exhibit F)

51. Yet the opposing counsels prepared Adrian to fabricate the facts that Adrian was close to Ian because Ian was Adrian's guardian so Adrian had been visiting Ian every year and acted as the "peacemaker" so as to mislead the Court.

52. Attorney's involvement in presenting a witness' perjured testimony is a fraud on the court. *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944); *Cleveland Demolition Co. v. Azcon Scrap Corp.*, 827 F.2d 984, 986 (4th Cir.1987)

53. The 9th Circuit Court held that,

> "the inquiry as to whether a judgment should be set aside for fraud upon the court under Rule 60(b) focuses not so much in terms of whether the alleged fraud prejudiced the opposing party but more in terms of whether the alleged fraud harms the integrity of the judicial process." In *Pumphrey v. K. W. Thompson Tool Co.*, 62 F.3d 1128, 1132-33 (9th Cir. 1995)

54. In *Dixon v. Comm'r of Internal Revenue*, 316 F.3d 1041, 1046 (9th Cir. 2003), the 9th Circuit further held that,

> "Furthermore, the perpetrator of the fraud should not be allowed to dispute the effectiveness of the fraud after the fact."

55. Similarly, the 4th Circuits held that,

> "once fraud enters the case in any manner, the judgment must be vitiated without further inquiry as to the materiality or effect of the fraud on the judgment". *Great Coastal Express, Inc. v. Int'l Brotherhood of Teamsters*, etc., 675 F.2d 1349, 1353-54 (4th Cir. 1982)

56. The 5th Circuits also held that,

> "once the determination is made that officers of the court have corruptly abused the judicial process, the court is not required to examine the effect that such conduct might have had on the ultimate judgment, but rather the court may rely on such conduct alone to set aside the judgment." *Browning v. Navarro*, 826 F.2d 335, 344 (5th Cir. 1987)

57. Therefore, we request this Court to vacate its 5/23/2022 order based on opposing attorneys, especially Attorney Womack's fraud on the court conduct.

**II. This Motion Is In Accordance With MRCP Rule 42(a) (1), (2), (3)**

58. Rule 42(a) allows consolidation or join for a hearing or trial, if actions before the court involve a common question of law or fact.

59. At present, the cases before 3 different courts (DP 17-0036, DV 21-811, and DP 22-0024 ) in this jurisdiction involve the common questions of law and facts, the same or similar issues, and depend largely upon the same evidence:

1. Whether Womack misrepresented facts and laws to the Courts and whether

"Exhibit C"

his misrepresentations constitute fraud on the court.

2. Whether the settlement signed by Ian estate's special administrator Andrew Billstein justifies Ian estate beneficiaries' intervention against Cindy and Womack because the beneficiaries' interests were not adequately represented.

60. This Court's 5/23/2022 order relied on Womack and Adrian's testimonies, and also greatly relied on judicial notice in its criticizing Ian's surviving actions.

61. However, the previous orders ruled in Womack's favor relied on Womack's court testimonies and statements, which are the subject of courts' fact-findings whether Womack made misrepresentations and perpetrated fraud on the court.

62. Consolidating the cases or a joint hearing will help the courts better understand and examine the related issues and facts.

63. In addition, consolidation or a joined hearing save court economy and avoid duplicated hearings, delays or unnecessary cost for the parties.

## CONCLUSION

64. The attorney's misrepresentations to the courts to circumvent the laws and manipulate court procedures and deprive the adversary parties' right to seek redress constitute fraud on the court. It is an attack to the integrity of the judicial system. The Court has a duty to treat this issue seriously to protect the public trust. For the above reasons, we respectfully request this Court to grant our motion to vacate its 5/23/2022 order and to consolidate the cases (or to hold a joint hearing).

"Exhibit C"

# DECLARATION

I declare under penalty of perjury that the information I set forth in this document is true and correct to the best of my knowledge.

Respectfully submitted: 10/20/2022

_____ , _____ , _____

Jenny Jing          Alice Carpenter    Mike Bolenbaugh

Interested Parties in Ian Elliot's Estate, Pro Se

## CERTIFICATION OF SERVICE

I certify that on the 20th day of October, 2022, I served a true copy of this document, via emails to:

Andrew T. Billstein  via andrew@bmslawmt.com

Joseph Womack,  via jwomack@jvwlaw.com

Cindy Elliot,  via jsoueidi@feltmartinlaw.com

Adrian Olson,  via acelegstrong@yahoo.com

Holly Marie Dudley,  via MotherHolly@gmail.com

Emily Sapp,  via emilyesapp@gmail.com

Mike Bolenbaugh,  via m.bolenbaugh@gmail.com

Alice Carpenter,  via up2u2do@gmail.com

Shelley Paterson,  via pattersonss@yahoo.com

W. Scott Green via sgreen@ppbglaw.com

_____ , _____ , _____

Jenny Jing          Alice Carpenter    Mike

**"Exhibit C"**

Jenny Jing
10 Alpine PL.
Kearny, NJ 07032
jennyianmt@gmail.com
Alice Carpenter
P.O. Box 22702
Billings, MT 59104
up2u2do@gmail.com
Mike Bolenbaugh
2351 Solomon Ave, Apt. 334
Billings, MT 59102
m.bolenbaugh@gmail.com
Pro Se

CLERK OF THE
DISTRICT COURT
TERRY HALPIN

2022 SEP 15 P 12: 51

FILED

BY_____
            DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS  DIVISION

| | |
|---|---|
| IAN ELLIOT,  And<br>Derivatively on Behalf of Starfire L.P.,<br>          Plaintiff,<br>v.<br>JOSEPH WOMACK, an Individual,<br>          Defendant, | Case No. DV 21-811<br>Hon. Judge  Ashley Harada<br><br><br>MOTION TO INTERVENE<br>AND BRIEF IN SUPPORT<br>OF INTERVENTION |

1.     Pursuant to Montana Rule of Civil Procedure Rule (MRCP) 24 (a) and (b)(1),

Alice Carpenter (Alice), Jenny Jing (Jenny), Mike Bolenbaugh (Mike),

(collectively Plaintiffs-interventors) respectfully submit our motion to intervene

and brief in support of intervention on the side of Plaintiffs Ian Elliot (Ian).   The

opposing party's counsel has stated they would object to this motion.

2.     We request a hearing. We also request this Court and interested parties to

**Exhhibit A**   Page 1 of 14

"Exhibit C"

serve the documents to our email addresses to prevent mail delays.

## BACKGROUND FACTS

3. Please refer to the attached complaint.

## ARGUMENT

## I. WE ARE ENTITLED TO INTERVENE AS OF RIGHT

4. We became interested parties after Ian passed away during this proceeding. With a combined 53.3% interest in Ian's estate, we have significant claims at stake in this litigation (see Exhibit A, Ian's Last Will).

5. We satisfy the requirement for intervention as of right under MRCP Rule 24(a).

> " Intervention under M. R. Civ. P. 24(a) requires satisfaction of four elements: (1) timeliness; (2) an interest in the subject matter of the action; (3) that the protection of the interest may be impaired by the disposition of the action; and (4) that the interest is not adequately represented by an existing party.  (citations omitted) *Three Blind Mice v. Price*, 2020 MT 292N

6. Our motion meets each of the four required elements.

## A. Our Motion Is Timely

7. Our motion is timely. We filed this motion after we know that Ian estate's special administrator Andrew Billstein  has not filed motion to substitute party in this litigation.

## B. We Have The Same Interest In The Subject Matter

8. The alleged Womack's fraud (misrepresentations to Ian and to the courts)

and breaches interfered and harmed Ian's inheritance from Ada's estate. This in turn interfered and harmed our share of inheritance from Ian's estate.

## C. Our Ability To Protect Our Interest Will Be Impaired Or Impeded If Ian's Actions Are Disposed Without Our Intervention

### 1. We Have Standing And We Satisfy Rule 24(a) Requirements

9. Although in general, only estate's personal representative has the standing to sue a 3rd person, Womack is not any 3rd person, he is the trustee of Ada's estate and Starfire. The Montana statute allows "a trustee or beneficiary" to petition the court for "compelling redress of a breach of the trust by any available remedy". MCA 72-38-213(2)(l).

10. We copy Ian's argument regarding this statute as follows: although Montana does not have a case interpreting whether this statute limits a beneficiary's redress only to the *current* trustee, the California's 2nd and 4th Appellate Courts have given their answers to a California's equivalent statute,

> "Section 17200 does not, by its terms, limit the beneficiary's right to compel redress of a breach of trust to a petition against a *current* trustee. Nor is there any decisional authority to that effect." *Estate of Bowles*, 169 Cal. App. 4th 684 - Cal: 2nd App. Dist., 5th Div. 2008), at 698 (emphasis original)

11. Please note that the Section 17200 clause mentioned in *Bowles*, the Section 17200 (b)(12) reads almost exactly as Montana's MCA 72-38-213 (2)(l).

12. In *King v. Johnston*, 178 Cal. App. 4th 1488 (2009), the 4th Appellate Court of California agreed with *Bowles*, and held that a beneficiary had standing to sue

"Exhibit C"

a former trustee and a third-party participant in a breach of the former trustee's fiduciary duties, or the third-party participant alone. The *King* court explained:

> "because 'primarily it is the beneficiaries who are wronged and who are entitled to sue....'[Citation.] The liability of the third party is to the beneficiaries, rather than to the trustee...", (Citing *Scott on Trusts,* 4th ed., § 282, §294; and *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* 68 Cal.App.4th 445, 467 [80 Cal.Rptr.2d 329] (1998)) *Id.*, at 1500

13.     These rulings reasoned that the beneficiaries' personal stake entitled their legal right to sue, especially when the suit is against a trustee.

14.     In *Trbovich v. United Mine Workers of Am.*, (404 U.S. 528, 538, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972)), a union member was represented by the Secretary of Labor in the litigation. The lower courts agreed with the Secretary and denied his intervention as of right from Rule 24(a), for the reason that the Secretary already represented his interest. The U.S. Supreme Court reversed the decisions and explained in its note that,

> 'The requirement of the Rule is satisfied if the applicant shows that representation of his interest "may be" inadequate; and the burden of making that showing should be treated as minimal.' *Id.*, Note 10.

15.     Accordingly, the 9th Circuit has consistently ruled that,

> 'We stress that intervention of right does not require an absolute certainty that a party's interests will be impaired or that existing parties will not adequately represent its interests. Rule 24(a) is invoked when the disposition of the action "may" practically impair a party's ability to protect their interest in the subject matter of the litigation, "unless existing parties adequately represent that interest."'*Citizens for Balanced Use v. Montana Wilderness,* 647 F. 3d 893 (9th Cir. 2011), see also *County of Fresno v. Andrus,* 622 F.2d 436 (9th Cir.1980)

"Exhibit C"

16. Our intervention satisfy the above requirements and circumstances.

## 2. Our Interest Cannot Be Protected Without This Court's Fact-finding Of A Scheme By Womack To Mislead The Courts

17. Our intervention requests this Court examine Womack's dishonest conducts aimed at the courts. In *Alexander v. Robertson*, (882 F. 2d 421, (9th Cir. 1989)), the 9th Circuit held that,

> "Since attorneys are officers of the court, their conduct, if dishonest, would constitute fraud on the court." citing *H.K. Porter Co. Inc. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115, 1119 (6th Cir.1976)

18. Montana law allows the beneficiaries to sue under special circumstances of

> "a showing of fraud, collusion, conflict of interest, inability to act or other special equitable circumstances". *Matter of Estate of Long*, 225 Mont. 732 P. 2d 1347 (1987)

19. In our complaint, we showed that Womack, together with Ada and Starfire's former fiduciary Cindy Elliot, deliberately planned and carefully executed a scheme to shield Cindy and also create unnecessary and lucrative service compensations to Womack.

20. First, Womack stated to every court that he did not know whether Cindy had wrongdoings without his accounting. This contradicts the fact what Womack did know and should have known.

21. Then, with a promise to the Federal Court that he would bring action against Cindy if he find wrongdoing, Womack dismissed Ada Estate's claims after delaying his accounting for 8 months.

"Exhibit C"

22. In Ada and Ian's probate courts, Womack then testified under oath that Ian's litigation against Cindy was without merits, or he did not have money to retain an attorney to bring actions against Cindy.

23. Among the different courts, Womack made different misrepresentations. He made a false promise to the Federal Court that he did not have any intention to keep, since his accounting does implicate Cindy's wrongdoings. Also, the Federal Court records indicates that Attorney Duke was already in the process of preparing the trial against Cindy. Womack "caged" Duke yet misrepresented to the state courts that he did not have money to retain an attorney.

24. As of today, Womack has conducted no accounting for Ada's Estate. Under Womack's direction to his accountant, the transactions in Ada's personal bank and credit card accounts which Cindy had sole access to were allocated as Starfire or Ada's expenses without being further examined.

25. In Ian estate court hearing, Womack testified under oath that he conducted Ada estate's accounting. When Jenny asked Womack to show where Womack's accounting report indicated Ada estate's accounting, Womack evaded the question after the objection from Cindy's counsel, who also acted as Womack's counsel in the hearing.

26. Our intervention supplement Ian's complaint, with additional facts and legal principles, showing Womack's misrepresentations were aimed at the courts in

"Exhibit C"

obtaining court rulings in his favor.

27. Without the intervention, the protection of our interest may be impaired by the disposition of Ian's actions, since Womack has been trying to dismiss this case with prejudice, thus to prevent the issue of his dishonest acts to the courts from being brought up forever.

### 3. Our Interests Will Be Affected If This Case Is Dismissed

28. Our interest is impaired when Womack is not hold responsible for more than $500,000 unnecessary service charges including an abusive document dumping of 34 boxes of duplicated and unrelated documents to his accountant. This increased Womack's accounting expenses to an estimated $160,000-$200,000 or more for a company's operation that only involved less than a dozen bills to pay annually. Under Womack's direction to his accountants, the accounting report avoided examining the transactions in Ada's personal bank and credit card accounts, thus significantly minimized Cindy's liabilities.

29. Even if the court allows Womack's accounting to be substantially recalculated after our contest, the recalculation will cause another hundreds of thousands of accounting and legal expense burdens for Ada's estate and Ian's estate because of Womack's document dump of thousands and thousands irrelevant documents to bury the relevant ones. We will be injured once again, if we cannot intervene to hold Womack accountable.

## D. <u>Our Interests May Not Be Adequately Represented</u>

30. To determine adequacy of representation, the 9th Circuit considers the following:

> "whether the interest of a present party is such that it will undoubtedly make all the intervenor's arguments; whether the present party is capable and willing to make such arguments; and whether the intervenor would offer any necessary elements to the proceedings that other parties would neglect."
> *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1498-99 (9th Cir. 1995).

31. We meet each factor.

32. Although we are the beneficiaries who have majority interests in Ian's estate, (53.33%) and want to pursue this litigation, we understand that Ian estate's representative Andrew Billstein has a duty to represent all of Ian estate beneficiaries' interests. This includes the beneficiaries who have minority interests (16.67%-21.67%) and expressed that they did not want to spend estate's money to pursue Ian's surviving actions. Therefore, Mr. Billstein's willingness and ability to protect our interests is limited, at least at this point.

33. When several beneficiaries including us insisted to be distributed with the real properties that Ian's estate was entitled to according to the law, Mr. Billstein, under the joint pressure from both Womack and Cindy, was only able to save one tract of 38 acres land for us, which consists only 15% of the total land, or 18% of the total appraised value.

34. Womack could have easily re-divided the properties and let Ian's estate to

"Exhibit C"

distribute the cash and properties according to beneficiaries' preferences. This is because the remaining 4 tracts of properties' rearrangement does not need government's approval. (MCA 76-3-207(1)(d))

35. We understand that Mr. Billstein, who is not a litigator and not practices in other law areas involved in this case (such as the area of legal professional liabilities), may not be willing to argue for us regarding another attorney's unethical behaviour or dishonest actions.

36. When Ian was alive, Womack took away Ian's counsel David Duke, then withheld Ian's distribution for almost a year to prevent and delay Ian's having sufficient fund to retain another attorney. We have the reason to believe that Mr. Billstein may also be at Womack's mercy in obtaining the fund to pay an attorney for the actions against Womack.

37. In addition, what is more unusual is that Womack has broader connections in Montana's legal community. When Ian and Jenny searched for attorney representation, as long as the issue involves Womack, the responses were either the case were too complicated, or there was conflict of interest. Ian and Jenny were told that Womack is a trustee in Montana Bankruptcy Court, the law firms have conflict of interest because they had or have work relationships with Womack. It is a reality that Montana has a small legal community where most lawyers know each other and not want to be involved, we ask the court to

"Exhibit C"

consider that this is a truly difficult circumstance for Ian then and now for us.

38.    Therefore, our intervention is necessary since it does not incur legal expenses for Ian's estate, because the parties are suppose to pay their own legal expenses according to the American Rule. We are committed to pay our own legal expenses in pursuing this action.

39.    This circumstance like ours is supported with precedent cases, such as *In re Estate of Bleeker*, (168 P. 3d 774 - Okla, 2007, at 781). In *Bleeker*, an estate's executor elects not to press a claim, reasoning the remote probability of recovering estate assets was not sufficient to warrant the expenditure to pursue the claim. The Oklahoma Supreme Court ruled that the beneficiary had standing in the circumstance to sue, since the beneficiary had asked to bear the expenses.

40.    In explaining its ruling, the Oklahoma Supreme Court cited more than a dozen cases from different states' appeal courts and supreme courts, including the Supreme Court of Montana (*State ex rel. Palmer v. District Court of the Ninth Judicial Dist.*, 190 Mont. 185, 619 P.2d 1201 (1980)), and held that

> "The dispositive first-impression question on certiorari is whether the American common law settled in the last century and half, which in circumscribed circumstances allows persons other than the estate's fiduciary to bring litigation for recovery of estate assets, should be adopted in Oklahoma. We answer in the affirmative and reverse the contrary trial court's ruling." *Bleeker*, at 776

41.    Our intervention satisfies the same circumscribed circumstances.

## II. ALTERNATIVELY, PERMISSIVE INTERVENTION IS APPROPRIATE

"Exhibit C"

42. In the alternative, we respectfully request the Court grant permissive intervention pursuant to Rule 24(b).

43. In *Spangler v. Pasadena City Bd. of Ed.*, (552 F.2d 1326, 1329 (9th Cir. 1977)), the 9th Circuit, citing cases from several circuits, held that in granting the permission, the court needed to examine several relevant factors such as:

1) "the nature and extent of the intervenors' interest, their standing to raise relevant legal issues, the legal position they seek to advance, and its probable relation to the merits of the case. ";
2) "whether changes have occurred in the litigation so that intervention that was once denied should be reexamined";
3) "whether the intervenors' interests are adequately represented by other parties";
4) "whether intervention will prolong or unduly delay the litigation";
5) "whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented."

44. We have stated in the previous sections that we satisfy the factors of intervention as of right for the factors mentioned in *Spangler* 1) , 2) and 3).

45. We also satisfy the factor 4) "whether intervention will prolong or unduly delay the litigation" *Id.*

46. Ian filed this litigation in July 2021. This court has not made any ruling. After Ian's death, it was Womack, who initiated Ian estate's litigation and delayed Ian estate's personal representative's appointment proceeding for at least 4 months, specifically for the purpose to prevent Ian estate's beneficiary, Ian designated personal representatives Ann Sargent and Jenny from retaining an

"Exhibit C"

attorney to represent Ian's estate to pursue this action. Therefore, Womack is the one to prolong and unduly delay this litigation, not our intervention.

47.     To satisfy factor 5), we offer specialized familiarity with the factual and legal issues.

48.     We will be able to offer our experience to counter Womack's misrepresentations to the court that Ian's action against him and Cindy were vexatious and "inflammatory". During the last decade, when Cindy spread disinformation attacking Ian for taking care of their mother Ada whom Cindy herself did not want to take care of, and placed Ada to live in a caregiver's basement and Ada suffered physical injuries, Ian's partner Jenny witnessed how Cindy treated Ada and Ian. Jenny also participated with Ian in Ada's 24/7 care. When Ada and Ian needed the help, we were Ada and Ian's only family. We supported Ian and gave Ada and Ian comfort.

49.     We also witnessed Ian's painful efforts to save his family's historical ranch from being sold to pay the unreasonable service fees for Cindy, then for Womack. Ian's partner Jenny also helped Ian to examine Ada and Starfire's bank transactions. With a MBA in finance, Jenny was able to discover Cindy and Womack's fraudulent bookkeeping practices in their financial reports.

50.     The 9th Circuit has consistently ruled that,

> "a liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts." *Wilderness Soc y. v. U.S. Forest*

"Exhibit C"

*Serv.*, 630 F.3d 1173, 1179 (9th Cir.2011), quoting *United States v. City of Los Angeles*, 288 F.3d 391, 397-98 (9th Cir. 2002)

51.  Depriving opposing parties' access to the courts is against our judicial system's fundamental principles. Womack's misrepresentations to the courts especially his manipulation of court procedures to deprive opponents' access to the courts, present a significant attack on the integrity of our judicial system.

52.  What happened to a disabled elderly person Ada, Ada's estate, Ian's estate, and Starfire's matters is extraordinary. Even under the courts' proceedings of more than 8 years as of today, there has been no accounting conducted by neither Ada's conservator nor by Womack regarding where the funds from Ada's personal bank and credit card accounts went to.

53.  Both Ada herself and Ada estate's beneficiary Ian suffered from their fiduciaries' unethical, unlawful, and predatory practices and cover-ups. At the same time, these fiduciaries manipulated to create hundreds of thousands dollars of unnecessary and lucrative service fees to benefit themselves. Our intervention not only is to protect our interests, but also to raise the court's attention to prevent the same tragedy from happening again to other Montana families.

54.  This court has the duty to prevent gross injustice caused by a court-appointed attorney's dishonest acts and manipulations, and to preserve the public trust and the integrity of our judicial system.

## CONCLUSION

"Exhibit C"

**55.** For the foregoing reasons, we respectfully request that this Court grant our Motion to Intervene, pursuant to MRCP 24(a) or 24(b).

## DECLARATION

I declare under penalty of perjury that the information I set forth in this document is true and correct to the best of my knowledge.

Respectfully submitted: 9/14/2022

_Jenny Jing_ , _Alice Carpenter_ , _Mike Bolenbaugh_
Jenny Jing          Alice Carpenter      Mike Bolenbaugh
Interested Parties in Ian Elliot's Estate, Pro Se

## CERTIFICATION OF SERVICE

I certify that on the 14th day of September, 2022, I served a true copy of this document, via emails to:

Thomas C. Bancroft
tbancroft@nelsonlawmontana.com

Andrew T. Billstein
andrew@bmslawmt.com

_Jenny Jing_ _Alice Carpenter_ _Mike Bolenbaugh_
Jenny Jing          Alice Carpenter      Mike Bolenbaugh

"Exhibit C"

August 15, 2013

Dear Ian,

I'm writing to you as general partner to general partner about a critical business task we must take care of for StarFire.

Our bank loan ("ag/real estate" loan category) requires us to maintain current real estate listings for the collateral property. To stay compliant with the terms of our bank financing, the partnership needs to take immediate action and renew the listings.

A listing does not require us to actually accept any offers. The only exception is the unlikelihood of an offer coming in for the exact listing price, or higher. The listings simply keep us in compliance and our funding in place, while we seek any number of different financial options for StarFire and the family.

The listings that have required renewal since June are for one 20 acre build site in the dry land, and for the Amsterdam Village Project. As of today we have a 6 week gap in compliance.

Our loan comes due for refinancing in five months. When the bank reviews it, we must be able to show we have made a continuous good faith effort since last February to sell property in order to pay off the principal. This is the bank's expected source of repayment. The key information they need to see on our refinance application is that we have maintained current listings.

If we can't prove this, the bank will be entitled: 1) to refuse to extend our loan, and 2) to initiate foreclosure on the lien property. That will mean taking over 40 prime acres in the center of the Amsterdam Village Project land, and the 20 acre build sites in Section 21. They will have the right to liquidate all of it for any price they wish, so long as it covers the $150,000 principal due on the loan.
For example, the combined properties could be worth several times that amount of money, but the bank would be allowed to sell all of it (perhaps even to a buyer of their own) for as low as $150,000 just to move it quickly.

Unfortunately, according to Glen, First Interstate does have a history of doing exactly this, foreclosing on many family farms and ranches in the area in similar situations to ours. This is not just a theoretical risk.

I hope you agree that, all anger and disagreements aside, this would be an utterly unwanted and unnecessary scenario. For you, for me, for the ranch, for our family.

Our family has been in unified agreement about selling the Amsterdam Village project since May 2006. The renewals are for listings that you have signed previously, several times.

Renewing our listings is not asking you to give up anything, your concerns, your questions, your sense of fairness or your rights to fully understand the partnership's past finances. It's simply asking you to continue exercising your current fiduciary responsibility to StarFire as a general partner.

If you are in agreement on just this one task, please call or send an email to our agent, Mary Ackerman, letting her know you will sign the two listing renewals: 406-587-2950 or mary@maryackerman.com. Please ask her any questions that will help with your decision.

She will look forward to hearing from you. It's important to respond to her by Tuesday, August 20. This will enable her to reinstate the listings on the MLS before September.

Meanwhile, please know I respect your requests for StarFire's financial history. I have been working over the summer to find and research the records so I can provide reports that will help answer your questions and concerns. The information you've asked for is extensive, and I appreciate your patience with the great amount of time this is requiring.

Thanks Ian.

My Best, *Cindy*

EXHIBIT
__B__

"Exhibit C"

## Listing Approved

Ian Elliot <elliotian@hotmail.com>
Fri 8/16/2013 7:59 PM
To: Cindy Elliot <naturelinkmt@aol.com>

Greetings!
thanks for your letter requesting the listing documents which I reviewed and have now signed and Faxed to Mary this afternoon. The documents were sent with the following cover letter:

8/16/13
TO: Mary E, Ackermann – ecOREsource
    Bozeman, MT
FROM: Ian R. Elliot – Starfire LP
    Billings, MT

Thanks Mary for your patience and understanding regarding our Starfire LP property issues. I signed and initialed the documents you sent me and am returning them via FAX. I remain committed to maximizing benefits from the eventual sale and/or development of Mother's inherited ranch property that she and her Ecton family have loved and nurtured for decades. I spent my summers as a teenager working as a ranch hand under the supervision of my Uncle Ray, and stayed in close touch with him over the years following that service. It is a treasured piece of real estate that continues to provide financial security for my Mom and immediate family members, and I wish to see this gift handled in a good and thoughtful way.

Sincere Thanks,
Ian

**Exhibit C**

In return for my timely cooperation, Cindy, I would greatly appreciate your restoration of August rental income from Mother's modular home for Mom's care use. I paid the advance on my health insurance and van lease in order to assure my self of a financial cushion (far less in the amount which you have enjoyed for more than two years with special accounts such as the $12,000 set aside for Mother's care with your name only listed on the account). Partnership breakdowns and serious misunderstandings have occurred because our family business related information has been withheld. It appears you set up numerous accounts in order to prevent both Gary and me from learning about your ranch related financial resources? Whatever the reason, I trust you will now be prepared to lay all cards on the table regarding Starfire LP instead of my having to force the issue. Keep in mind that my financial activities (cards) related to family resources remain open for your review anytime you need to see transaction documents. For now, please consider my request and restore the modular home rent to help me supplement Mother's care for which it was intended.

Onward and Upward,
Ian



First Interstate Bank
401 N. 31st St.
P.O. Box 30918
Billings, MT 59116-0918
406-255-5000
www.firstinterstatebank.com

October 19, 2015

Ian Elliot
2512 Golden Blvd.
Billings, MT 59102

RE:    October 13, 2015 Correspondence on StarFire, LP

Dear Ian:

I am sending this letter in response to your correspondence that was delivered to my office on October 13, 2015, and also emailed to me on the same day. I am also informing you that I am copying Cindy Elliot on this letter as the other General Partner of Starfire, LP.

Please find the following responses in order of the above mentioned correspondence from you.

1. You are correct that First Interstate Bank did not require StarFire, LP to ever list any property for sale as a condition to any loan agreement.

2. As part of the original loan application, Starfire LP did present documentation of a Real Estate Purchase Contract and Option Agreement it had already entered in with The Village at Amsterdam, LLC (C/o CTA Architects Engineers). StarFire, LP was requesting interim financing for the Elliot family to allow CTA Architects Engineers time to raise the funds to execute this agreement. This agreement was signed on June 2, 2006 by Cindy Elliot and Ian Elliot, General Partners of StarFire, LP.

3. I have not enclosed any loan agreements related to StarFire, LP as no requirement was ever made by the bank as outlined above in paragraph 1.

# Exhibit D

I hope that you find this is the information that you have requested. Please feel free t contact me if you have any questions.

Sincerely,

Jared M. Maloney
Vice President
Commercial Loan Officer
(406) 255-5262

Cc: Cindy Elliot, General Partner StarFire, LP

Date: Wed, 4 Jul 2012 03:41:28 -0700
From: acelegstrong@yahoo.co
Subject: Re: LOVE AND HEARTFELT APPRECIATION!
To: elliotian@hotmail.com

You guys are all pretty much idiots for all I'm concerned, keep wasting the estate, and die in debt, find the tax collectors, and all the bullshit you let me face, once my mom Carolyn was dead, you can find a new family!! yeah I found my self, and a new family that would never ever leave me the way you suckers left me, 15 a felon and no where to go, fuck you Elliots, Finally how I have felt for the last 15 years, poor Ada, she and Archie deserved so much better, artistic, retarded, great grades make you insane, what do you have now, all my moms art, all the originals, the ones I have had, my Dad gave to me, huddle around that art and wait for a storm, and lose half of it and cry to your self, possessive, and I cant still get one piece, one fucking original, why do you think I don't respond, good luck, you think I'm not really myself you abandoned, yes this is what you wanted, go back when my mom was on her death bed, I was 15 years old, now I'm a man and would never bring a woman home close to you, after last time, give me art, or your death, make me feel enabled, like I care really, some morbid life I live before I die, just some art on the wall of my moms, really? can you do that for me, the hand drawn picture of my profile when I was six, just give it to me, you selfish fucks, really think about the square box you live in, with out my moms art for me, find me after we all die, Thanks Adrian, see you then maybe, hell to pay, I was just a little kid................ you have no idea, think about it, lost soles?

**Exhibit E**

**"Exhibit C"**

## FW: greetings

Ian Elliot <elliotian@hotmail.com>

Mon 5/13/2013 8:12 PM

To: ADRIAN OLSON <acelegstrong@yahoo.com>

Mom and I are still hoping to hear from you, Adrian. Meanwhile, I received this email today and think your computer's address list might have been compromised? Please remember how much you mean to both your Grandma Ada and I, and consider a call, email or even a visit while Mom is still alive and doing the best she can under the circumstances. We miss you, Adrian.

Love & Spring Blessings,
Ian and Grandma Ada

---

Date: Mon, 13 May 2013 11:47:34 -0700
From: acelegstrong@yahoo.com
Subject: greetings
To: cmaiberger7@gmail.com; g8keeper@pacbell.net; elliotian@hotmail.com; jennifer_heyden@yahoo.com

http://villadiamond.gr/likeit.php?vhpzsx822hh

# Exhibit F

**"Exhibit C"**

MONTANA THIRTEENTH JUDICIAL DISTRICT COURT, YELLOWSTONE COUNTY

IN THE MATTER OF THE ESTATE OF:

IAN RAY ELLIOT,

Deceased.

Cause No.: DP 22-34

Judge Rod Souza

ORDER **GRANTING** MOTION FOR LEAVE TO FILE CORRECT EXHIBIT, **DENYING** MOTION TO VACATE MAY 23, 2022 ORDER, **DENYING** MOTION TO ALLOW INDEPENDENT ACTION, AND **DENYING** MOTION TO CONSOLIDATE

This matter comes before the Court on the Motion to Vacate the Court's May 23, 2022 Order, Allow an Independent Action for Fraud on the Court, and to Consolidate Cases of Interested Parties Jenny Jing, Alice Carpenter, and Mike Bolenbaugh (hereafter "Jenny, Alice, and Mike.") [Dkt. 59.] Preliminarily, **IT IS HEREBY ORDERED** that Jenny's, Alice's, and Mike's Motion for Leave to File the Correct Exhibit is **GRANTED**. [*See* Dkt. 69 at 1.] Jenny, Alice, and Mike state they intended "to submit [as Ex. A to their motion, their] proposed complaint against Womack [that] accompanied [their] motion to intervene [in] DV 21-811." [Dkt. 68 at 1-2.] This Order therefore considers that proposed complaint [Dkt. 21 in DV 21-811] as Ex. A to the Motion to Vacate.

The Court's May 23, 2022 order granted Petitioner Joseph Womack's Petition (that Interested Person Cindy Elliot (hereafter "Cindy") joined) for Supervised Administration of Ian's Elliot's Estate. [Dkt. 45.] The Order also appointed Andrew Billstein, Esq. as Special Administrator of Ian's Estate. [Dkt. 45.] In granting the Petition, the Court made extensive

1

Findings of Fact and Conclusions of Law. [Dkt. 45.] Special Administrator Billstein and Cindy oppose Jenny's, Alice's, and Mike's Motion. [Dkts. 65, 66.]

Citing M.R.Civ.P. 60(b), Jenny, Alice, and Mike assert Jenny made a mistake worthy of vacating the order when she testified she "thought she received [about $2,000] from Ian in 2021" when, after review of bank statements she avers owing $8,900. [Dkt. 59 at 6-7.] However, Jenny's change is a distinction without a difference. After review of Ian's bank statements [Ex. V] Finding of Fact 59 found Jenny's debt was $21,000. Jenny now acknowledging to owe Ian's Estate $8,900 still constitutes her disputing owing $21,000. *See, also, In the Estate of Gober*, 350 S.W.3d 597, 600 (Tex. Ct. App.-Texarkana 2011) ("The distinction [regarding when a conflict of interest renders an executor unsuitable] lies in whether there is a dispute about the estate's assets....") Moreover, Conclusion of Law 17 quoted *Estate of Anderson-Feeley*, 2007 MT 354 at ¶ 13, which stated "[t]he existence of a potential claim against Feeley is sufficient to create a conflict of interest, and such conflict of interest is sufficient for removal of Feeley as personal representative of Jan's estate." *See, also, In re Estate of Peterson*, 265 Mont. 104, 109, 874 P.2d 1230, 1233 (Mont. 1994) (quoting *In re Rinio's Estate*, 93 Mont. 428, 435, 19 P.2d 322, 325 (Mont. 1933) ("The law does not look with favor upon the administration of estates by a person where conflicts in the performance of his duty are likely to arise."))

Jenny, Alice, and Mike cite *In re Estate of Jochems*, 252 Mont. 24, 826 P.2d 534 (Mont. 1992) (partially overruled on other grounds). [Dkt. 68 at 11.] *Jochems* is inapplicable. It addresses whether a testator was competent to transfer certificates of deposit. *See* 252 Mont. at 29-30, 826 P.2d at 537. Jenny, Alice, and Mike reference *In re Estate of Graf*, 150 Mont. 577, 437 P.2d 371 (Mont. 1968). [Dkt. 68 at 11-12.] *Graf* is distinguishable. It instructs a Montana

2

probate court cannot set aside a testator's choice of executor based on possibilities. 150 Mont. at 579-80, 437 P.2d at 372-73. Jenny's conflict of interest is more than possible. In the face of claims and documentary evidence that she owes Ian's Estate $21,000, Jenny claims she owes $8,900, a substantially lesser amount. Furthermore, as Finding of Fact 58 states "Jenny's debt to the Estate, the extent of which she denies incentivizes Jenny to delay Estate administration."

Jenny, Alice, and Mike assert Jenny made another mistake worthy of Rule 60(b) relief in that "she did not know she could object to judicial notice." [Dkt. 59 at 7.] "[T]here is no ground for a Rule 60(b) motion where the mistake is purely a mistake of law, as ignorance of the law is no excuse." *Donovan v. Graff*, 248 Mont. 21, 25, 808 P.2d 491, 494 (Mont. 1991). Moreover, the Court can give Jenny latitude as a *pro se* litigant, it cannot prejudice the other parties in doing so. *See Greenup v. Russell*, 2000 MT 154, ¶ 15, 300 Mont. 136, 3 P.3d 124. Giving Jenny legal advice would have significantly prejudiced Womack and Cindy. *See, also*, *Duffy v. State,* 2005 MT 228, ¶ 17, 328 Mont. 369, 120 P.3d 398 (Court officers cannot provide legal advice). Regarding mistake, Jenny, Alice, and Mike finally assert Jenny "was too embarrassed to keep asking the [C]ourt or the witness to repeat what she did not hear well." [Dkt. 59 at 7.] This is not a basis for Rule 60(b) relief.

Citing M.R.Civ.P. 60(d), Jenny, Alice, and Mike assert Womack committed fraud on the court by stating "he conducted Ada['s] estate's accounting"; "Jenny talked Ann [in]to refus[ing to] converse with him;" and Jenny "refused to provide" Ian's will. [Dkt. 59 at 8-9.] During the March 7, 2022 hearing Womack testified "I have completed the accounting, I just got the accounting back from Wipfli, it's a forensic accounting, that was done." This testimony was accurate. Womack hired Wipfli to perform an accounting of Ada's Estate, and Wipfli completed their accounting. Jenny, Alice, and Mike quote *Dixon v. Comm'r of Internal*

3

*Revenue*, 316 F.3d 1041, 1046 (9th Cir. 2003). [Dkt. 59 at 13.] "Fraud on the court occurs when the misconduct harms the integrity of the judicial process." 316 F.3d at 1046. Accurate testimony is not misconduct, and accurate testimony cannot harm the judicial process's integrity.

Regarding Jenny convincing Ann to refuse to talk to him except in writing, Womack testified "I did draw the inference from…Jenny…sa[y]ing…things to [Ann] about me[.] I drew that inference because Ian at some point in my relationship with him and Jenny…refused to talk to me any [m]ore[a]nd would only communicate through emails or letters. So my assumption was…they told [Ann] that's how [she] should act." Womack's testimony on April 1, 2022 additionally explained the drawbacks to requiring written communication. That requirement precludes "hav[ing] some discussion and…an exchange of ideas." Womack additionally testified only communicating in writing makes it "very difficult to get anything accomplished, [is] time-consuming," and impractical.

Drawing inferences is not fraud. Moreover, Jenny, Alice, and Mike have asserted fraud on the Court. [Dkt. 59 at 8-10.] They quote *Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128, 1132-1133 (9th Cir. 1995). [Dkt. 59 at 12.] *Pumphrey* instructs fraud on the court "must involve an unconscionable plan or scheme which is designed to improperly influence the court in its decision." 62 F.3d at 1131. Drawing inferences is neither unconscionable nor designed to improperly influence.

During the March 7, 2022 hearing, Womack explained what he meant by refusal to provide the will. "I requested a copy of the Will, and you [i.e. Jenny] did not send it to me, and then you said that you were going to wait and you weren't going to [do] anything for a period of time, you were obtuse, all you had to do was say, yes, Joe, here is a copy of the Will. And you

4

didn't do that. So I took that as a refusal." Womack further explained "even after [Jenny] attempted to file the petition, [Jenny] didn't send me a copy of that with a copy of the Will either." Womack did not need to provide Jenny's reasoning for his basis to use the word refusal to be accurate.

Jenny, Alice, and Mike quote *Alexander v. Robertson*, 882 F.2d 421 (9th Cir. 1989). [Dkt. 59 at 8.] *Alexander* strongly supports denying their motion. When it involves fraud by officers of the court, fraud on the court prevents "the judicial machinery [from] perform[ing] in the usual manner its impartial task of adjudging cases that are presented for adjudication." 882 F.2d at 424. *See, also, In re Estate of Swanberg*, 2020 MT 153, ¶ 13, 400 Mont. 247, 465 P.3d 1165 ("Submitting a will that may be subject to a will contest is not fraud on the court.") Jenny's, Alice's and Mike's claims do not satisfy *Alexander's* high standard.

Jenny, Alice, and Mike assert Womack "misrepresented to the Montana Supreme Court [that] Ian obstructed his administration" and cite Jenny's use of Cindy's and Womack's court exhibits to "sho[w] Ian did not obstruct...the cases." [Dkt. 59 at 9.] First, the evidence received strongly supported the extensive Findings of Fact (12, 24-47, Dkt. 45) the Court made otherwise. To succinctly illustrate, Finding of Fact 25 states "Judge Brown moreover 'direct[ed Ian] to Rule 11, M.R.Civ.P., specifically including Rule 11(b), relating to the representations made to the Court by a party upon the filing of any pleading, motion, or other paper, and the availability of sanctions for a violation of Rule 11 by a party." (citing DV14-829, Dkt. 67 at 4.)] Finding of Fact 29, referencing the high threshold in Montana to dismiss claims, states "[d]espite this high threshold, Judge Harada dismissed all of Ian's claims that she was specifically asked to dismiss." (citing DV 18-536, Dkt. 28.) Finding of Fact 33 states "Judge Knisely dismissed [Ian's lawsuit suing Womack personally] at the pleading stage." (citing DV

5

**"Exhibit D"**

20-244, Dkt. 16). Lastly, in Finding of Fact 38, this Court opined "[i]t is remarkable Judge Knisely had to threaten incarceration to achieve compliance with a court order." (citing Ex. E-3 at 2).

Second and equally important, the Montana Supreme Court has strongly rejected the argument Ian was not obstructionist. *In re Estate of Elliot*, 2022 MT 91N. "The record demonstrates that, however sincere he may have been, Ian obstructed Womack's administration with constant litigation and unfounded accusations. He filed numerous, lengthy motions objecting to almost every action by Womack, and even sued him twice personally. Ian forced Womack to fight for virtually every decision, even those that the District Court expressly placed within his discretion, most notably obtaining a full accounting of StarFire." 2022 MT 91N at ¶ 19. According to the Montana Supreme Court, Ian's position was "not the reality of the situation." 2022 MT 91N at ¶ 23. "Ian similarly struggled to stay within the scope of questioning and limit his arguments to the present issues during hearings." *Id.* at ¶ 28.

Jenny, Alice, and Mike assert it was fraud on the Court for Womack not to allow Jenny and Ann to file a reply brief for Ian's claims regarding Ada's Estate on appeal to the Montana Supreme Court. [Dkt. 59 at 9-10.] "Only 'the most egregious conduct' [such as "bribery, evidence fabrication, and improper attempts to influence the court by counsel"] will rise to the level of fraud upon the court." *Falcon v. Faulkner*, 273 Mont. 327, 332, 903 P.2d 197, 200 (Mont. 1995). Womack not allowing Jenny and Ann file a reply brief because the issue of special administration was pending before the Court is not similar to these examples. Jenny, Alice, and Mike quote *Selway v. Burns*, 429 P.2d 640 (Mont. 1967). [Dkt. 59 at 9-10.] *Selway* does not support their position. Fraud on the court "may be achieved either by affirmatively misrepresenting facts…or by concealment of facts by a person who was under a legal duty to

6

make a full disclosure to the court." 150 Mont. at 9, 429 P.2d at 644 (internal citation omitted). Womack exercising his legal right to oppose Jenny's and Ann's request to file a reply brief is not affirmative misrepresentation or knowing concealment.

Jenny, Alice, and Mike reference Ex. A, which is now Dkt. 21 in DV 21-811. [Dkt. 59 at 8.] Ex. A references *inter alia* Mont. Code Ann. § 72-3-902 and in-kind distributions, condemns Womack's decision to have Wipfli perform an accounting, and accuses Womack of artificially inflating expenses for his own personal gain. The Montana Supreme Court has already rejected these arguments. "[T]he statute gives preference to in-kind distribution only to the extent possible. As the personal representative, Womack 'ha[d] the power to sell estate property if necessary for the estate's administration.'" *Estate of Elliot*, 2022 MT 91N at ¶ 22. "[T]he accounting was essential to ending the seven years of litigation over StarFire and the almost five years of litigation over the Estate." *Elliot*, 2022 MT 91N at ¶ 22. "Despite his oft-stated purpose to save money for the Estate, Ian's interference objectively and significantly increased costs and delays, further necessitating the second sale. Womack spent a considerable amount of time responding to Ian's various motions and lawsuits, time which was necessarily charged to the Estate." 2022 MT 91N at ¶ 23.

Lastly, Jenny, Alice, and Mike assert Womack and Cindy's attorney knowingly presented the false testimony of Adrian Olson, Ian's nephew. [Dkt. 59 at 11-12.] The Court notes they do not challenge [*see* dkt. 59] Adrian's testimony that is the basis of the Court's Fourteenth Finding of Fact that states "Adrian provided compelling testimony regarding the role of Jenny…in Ian's ongoing litigation strategy." The Court's Finding of Fact 15 states that "Adrian and Ian were very close….Adrian would visit Ian in Montana yearly." Finding of Fact 16 calls Adrian a peacemaker for proposing a settlement to end Ian's and Cindy's longstanding

7

litigation. Finding of Fact 17 observes "Cindy and Ian agreed[,] Jenny…became upset with Ian[, a] heated argument ensued, [and] Jenny's disagreement led Ian to reject Adrian's proposal." Jenny, Alice, and Mike argue these findings are based on Adrian's false testimony and cite the Court to Exs. B-F to their motion. [Dkt. 59 at 11-12.]

Ex. E is an angry email dated July 4, 2012 from Adrian's email address to Ian. One angry email does not show it was false for Adrian to testify he and Ian were very close. Moreover, Ex. F is an email from Ian to Adrian dated May 13, 2013 stating Ian and Ada "are still hoping to hear from…Adrian." Ian's email shows he did not want to cut all ties with Adrian and did not believe Adrian's angry email meant they would no longer speak.

Ex. B is an August 15, 2013 letter from Cindy to Ian. Ex. C are communications (two of which occurred on August 16, 2013) from Ian stating he signed listing documents and asking the August rental income be used for Ada's care. Ex. D is a letter from a First Interstate Bank Vice President dated October 19, 2015 responding to Ian's inquiries received on October 13, 2015. Exs. B, C, and D are wholly irrelevant to Adrian proposing and presenting a settlement to Ian and Cindy in 2013. Contrary to Jenny's, Alice's, and Mike's motion [dkt. 59 at 11-12], Adrian's testimony did not reference a listing agreement or a property sale contract. Adrian referenced "a very generic solution" that had not yet decided whether to use a real estate agent or attorney. Further, when Jenny directly referenced a listing agreement when asking Adrian of his proposal, Adrian answered "[i]t wasn't a conversation about listing the property, it was just a family conversation."

Jenny, Alice, and Mike characterize the duty of the administrator of Ian's estate is to "act zealously in defending and protecting Ian's estate [from] adversaries Cindy and Womack." [Dkt. 68 at 6.] As the Court stated in Finding of Fact 56 "Womack is not only the Special

8

Administrator of Ada's Estate but also StarFire's liquidating partner. The major asset of Ada's Estate is land still owned by StarFire. Thus, whether it is a special administrator or a personal representative handling Ian's estate, that person must work with Womack."

Unsuitability authorizing removal as personal representative "may...be based upon...a mental attitude toward his duty...that creates reasonable doubt whether the executor or administrator will act honorably, intelligently, efficiently, promptly, fairly and dispassionately in his trust." *District Attorney for the Norfolk Dist. v. Magraw*, 628 N.E.2d 24, 27 (Mass. 1994). Such unsuitability can also arise "upon any other ground for believing that his continuance in office will be likely to render the execution of the will or the administration of the estate difficult, inefficient or unduly protracted." *Ashley v. Ashley*, 405 S.W.3d 419, 426 (Ark. Ct. App. 2012). *See, also, Long v. Willis*, 113 So. 3d 80, 83-84 (2d Dist., Fla. Ct. App. 2013) ("Unsuitableness to administer may well consist in an adverse interest of some kind, or hostility to those immediately interested in the estate, whether as creditors or distributees, or even of an interest adverse to the estate itself.") The Court in detailed findings, concluded Jenny would not work with Womack. [Dkt. 45.]

Lastly, Jenny, Alice, and Mike again argue "Womack is not a creditor of Ian's estate." [Dkt. 68 at 6.] As the Court stated in Conclusion of Law 18 of Dkt. 45:

> "Judge Knisely issued an order approving an "[a]greement for StarFire...to Make Loans to Limited Partners and Heirs." [Ex. Z.] Moreover, in correspondence with Womack, Ian called the transaction a "loan." [Ex. L.] Therefore, Womack is a creditor."

To summarize, like the Rule 59 motion Ian filed before Judge Knisely in the probate of Ada's Estate, Jenny's, Alice's, and Mike's motion does "not remotely rise to the level required for" the relief sought. [*See* DP 17-36, Dkt. 161 at 4.] Assuming arguendo Jenny, Alice, and Mike had shown falsity, the Montana Supreme "Court has repeatedly held that fraud between

9

the parties, such as perjured testimony at trial, does not rise to the level of fraud upon the court." *See In re Marriage of Hopper*, 1999 MT 310, ¶ 24, 297 Mont. 225, 991 P.2d 960. *See, also, Traders State Bank v. Mann*, 258 Mont. 226, 237, 852 P.2d 604, 610-11 (Mont. 1993) (partially overruled on other grounds) ("[F]orceful argument' and 'artful pleading' do not rise to the egregious conduct contemplated by this rule, but more closely relate to the Lawyer Defendants' exercise of their duty to zealously represent their client.")

**IT IS HEREBY ORDERED** that Jenny's, Alice's and Mike's Motion to Vacate the Court's May 23, 2022 Order and to Allow an Independent Action for Fraud on the Court IS **DENIED**.

Jenny, Alice, and Mike lastly request the Court consolidate this case with DP 17-36, *In re Estate of Ada Elliot*, and DV 21-811, *Ian Elliot, individually and derivatively on behalf of StarFire, L.P., v. Womack*. [Dkt. 59 at 13-14.] Since the Court is a probate court, it has limited jurisdiction. *See In re Estate of Cooney*, 2019 MT 293, ¶ 13, 398 Mont. 166, 454 P.3d 1190 ("The probate court's limited jurisdiction does not extend to adjudicating a breach of contract claim."). Accordingly, the Court cannot consolidate the cases.

**IT IS HEREBY ORDERED** that Jenny's, Alice's, and Mike's Motion to Consolidate is **DENIED**.

DATED: this _____9ᵗ_____ day of _____December_____, 2022.

Hon. Rod Souza, District Court Judge

cc:  Ann Taylor Sargent (via email) ann2022ian@gmail.com

Jenny Jing (via email) jennyianmt@gmail.com

10

**"Exhibit D"**

Joseph Womack, Esq. (via email) jwomack@jvwlaw.com

Cindy Elliot, via Jeffrey A. Hunnes, Esq. (via email) jhunnes@feltmartinlaw.com

Cindy Elliot via Joseph Soueidi, Esq. (via email) jsoueidi@feltmartinlaw.com

Adrian Olson (via email) acelegstrong@yahoo.com

W. Scott Green, Esq. (via email) sgreen@ppbglaw.com

Holly Marie Dudley (via email) MotherHolly@gmail.com

Emily Sapp (via email) emilyesapp@gmail.com

Mike Bolenbaugh (via email) m.bolenbaugh@gmail.com

Alice Carpenter (via email) up2u2do@gmail.com

Shelley Paterson (via email) pattersonss@yahoo.com

Ray Ecton & Ian Elliot Trust, via email to Jenny and Ann at their emails *supra*

Andrew Billstein, Esq. (via email) andrew@bmslaw.com

Adrianna Potts, Esq. (via email) apotts@pottlawpllc.com

CERTIFICATE OF SERVICE

This is to certify that the foregoing was duly served by email/mail or hand delivery upon the parties or their attorneys of record at their last known addresses this 9th day of November, 2022.

BY _Joanna Mae_

Judicial Assistant to Hon. Rod Souza

11

# CERTIFICATE OF SERVICE

I, Michael Manning, hereby certify that I have served true and accurate copies of the foregoing Motion - Opposed to the following on 01-23-2023:

Jeffery A. Hunnes (Attorney)
2825 3rd Avenue North
Suite 100
Billings MT 59101
Representing: Cindy Elliot
Service Method: eService

Jenny Jing (Appellant)
10 Alpine Place
Kearny NJ 07032
Service Method: E-mail Delivery

Alice Carpenter (Appellant)
P.O. Box 22702
Billings MT 59104
Service Method: E-mail Delivery

Mike Bolenbaugh (Appellant)
2351 Solomon Avenue, Apt. 334
Billings MT 59102
Service Method: E-mail Delivery

Joseph V. Womack (Appellee)
1001 S. 24th Street West, Suite 318
Billings MT 59102
Service Method: E-mail Delivery

Electronically signed by Amy Martin on behalf of Michael Manning
Dated: 01-23-2023